[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 25, 2004
THOMAS K. KAHN
CLERK

No. 02-16167

_____

D. C. Docket No. 02-20238-CR-DLG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORGE NICOLAS ACOSTA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 25, 2004)**

Before TJOFLAT and CARNES, Circuit Judges, and CONWAY*, District Judge.

_____
     * Honorable Anne C. Conway, United States District Judge for the Middle District of
Florida, sitting by designation.

CARNES, Circuit Judge:

Jorge Acosta was indicted on these three drug-related counts: conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 846, 841(b)(1)(B); possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). After the district court denied his motion to suppress some of his statements and part of the other evidence against him, Acosta conditionally pleaded guilty to all three counts reserving his right to appeal the denial of the motion. This is that appeal.

## I.

An undercover officer with the United States Customs Service High Intensity Drug Trafficking Area Group (HIDTA) informed his fellow officers that he anticipated making a monetary exchange of $190,000, as part of a money laundering operation, with a then-unidentified suspect near the corner of 107th Avenue and 88th Street in Miami on the afternoon of February 26, 2002. Two officers who worked with the anti-drug group, Kenneth Loveland and Eric Sallick, were assigned to wait in a Publix Supermarket parking lot near 107th Avenue and 88th Street to conduct surveillance and take photographs of the exchange.

2

Loveland was told by the undercover officer, who was in contact with the suspect, that the suspect was driving a silver Nissan Xterra.

On that afternoon, Officer Loveland photographed Acosta driving a silver Nissan Xterra through the Publix parking lot while talking on his cell phone. At the very moment Acosta was talking on his cell phone, the undercover officer, who was in contact with Loveland, was talking on his phone with the suspect. The undercover officer was instructed to tell the suspect that the money exchange would not take place that day. After he did so, Acosta drove the Xterra out of the parking lot and to an apartment complex. Once there, he parked his Xterra next to a gold Lexus, removed a black gym-bag with red trim from the Xterra, and gave the bag to the driver of the Lexus. Acosta then drove away in the Xterra. Surveillance was terminated for the evening.

The next morning officers re-established surveillance at Acosta's residence. The undercover officer informed the surveillance officers that the money exchange had been rescheduled for that day and that the amount of the exchange had increased from about $190,000 to around $300,000. While they were watching, Acosta left his residence and drove to a bank. He then drove to the apartment complex where he had handed off the gym-bag the night before. Acosta went into an apartment and came out with another man, later identified as Alberto Sade,

whose apartment it was. One of them was carrying a gym-bag that appeared to the officers to be the same bag they had seen Acosta with the day before. The bag was put into the Xterra, and both men got into that car.

The undercover officer informed the surveillance officers that the suspect was on his way to deliver the money to him. The officers surveilling Acosta decided to stop him outside Sade's apartment before he and Sade could drive away. They pulled their cars behind Acosta's Xterra in the parking lot of the apartment building and five or six officers approached the car. At least one officer had his gun drawn, but all of the officer's guns were re-holstered within ten-seconds.

An officer immediately told Acosta that he was not under arrest but that they wanted to talk to him about a money laundering investigation. Acosta gave his identification to the officers and at some point was patted down. An officer asked Acosta if he had any money, weapons, or drugs in the car, and he said that he did not. Acosta then gave his written consent for officers to search his car. After consenting to the search, but before it took place, Acosta admitted to the officers that there was money in the car. The search uncovered two bags filled with currency totaling approximately $278,000.

The passenger in the Xterra, Sade, told the officers that he lived in the apartment he and Acosta had just left, and he consented to the officers searching it.

4

Inside the apartment the officers found a duffel-bag with a small padlock on it. An officer asked Sade if he had the key to the lock and he replied that the bag belonged to Acosta, who had the key. Customs Officer Sallick went outside to ask Acosta for the key.

Officer Sallick testified at the suppression hearing that when he asked Acosta for consent to search the duffle-bag and the key, Acosta "said 'yes[,] [o]f course,' reached into his pocket and produced a set of keys and gave them to me." The officers did not attempt to get Acosta's written consent to search the duffle-bag. When they unlocked and opened the bag using the key Acosta had given them, the officers discovered more currency and some pellets. The pellets appeared to the officers to be (and later tests would confirm that they were) heroin. At that point, an officer read Acosta his Miranda rights and placed him under arrest. After he had been advised of his rights, Acosta told the officers that the heroin belonged to him and that Sade was not involved.

After making that admission, Acosta was then taken to the United States Customs Service HIDTA headquarters where he was interviewed. Shortly after the start of the interview, Officer Ocasio asked Acosta to read a Miranda rights form aloud and to initial each paragraph as he went through the form. Acosta

5

acknowledged that he understood his <u>Miranda</u> rights both by initialing each paragraph of the form and also by reading the entire form aloud.

The following exchange then took place in Spanish:

OCASIO:     Now, uh... do you want to waive your rights or not?

ACOSTA:     No, I'm not going to waive my rights.

OCASIO:     Okay.

ACOSTA:     I can collaborate, I can talk with you now...

OCASIO:     Do you want to talk to us?

ACOSTA:     I'll talk with you... (UI) my interrogation...

(ellipses as found in original)  Officer Ocasio attempted to explain to Acosta what it meant for Acosta to waive his rights.  Acosta then said: "I am going to cooperate with you at this moment, right at this very instant.  To me [] everything you need, I can answer all your questions without the need to sign that I waive my rights [] because I am not going to waive my rights."   Officer Ocasio then continued interviewing Acosta.  During the interview Acosta identified the person who had given him the bag containing the money and heroin, and to whom he was to deliver the money he received.  He also told Officer Ocasio his pay for delivering the money was $10,000.

**II.**

6

After being charged, Acosta moved to suppress all physical evidence seized from his person, the duffle-bag that was seized from Sade's apartment, and all of the statements Acosta made after being confronted by the officers outside Sade's apartment, including those he made after being arrested and read his Miranda rights. A magistrate judge held an evidentiary hearing on the motion to suppress, and filed a report and recommendation, which was followed by a corrected report and recommendation. The district court held a hearing on the issues relating to the statements that Acosta had made at the United States Customs Service HIDTA headquarters. After that hearing, the district court issued an order adopting the magistrate judge's corrected report and recommendation in its entirety and denying Acosta's motion to suppress.

Acosta then entered a conditional guilty plea reserving his right to appeal the denial of his motion to suppress. He was adjudicated guilty and sentenced to 46 months in prison to be followed by 4 years of supervised release.

### III.

On a district court's denial of a motion to suppress, we review its findings of fact only for clear error and its application of law to those facts de novo. See United States v. Blackman, 66 F.3d 1572, 1577 (11th Cir. 1995).

7

Acosta contends that the initial stop was not the kind of stop that Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), permits to be made without probable cause, because the officers lacked reasonable suspicion to detain him. He also contends that even if they did have reasonable suspicion to make a valid Terry stop, the stop matured into an arrest at some point before the officers had probable cause, and as a result all the evidence obtained after that point should be suppressed. We disagree with both of his contentions.

In Terry, the Supreme Court adopted "a dual inquiry for evaluating the reasonableness of an investigative stop." United States v. Sharpe, 470 U.S. 675, 682, 105 S. Ct. 1568, 1573 (1985) (citing Terry, 392 U.S. at 20, 88 S. Ct. at 1879); see also United States v. Powell, 222 F.3d 913, 917 (11th Cir. 2000). Under Terry's two-part inquiry, we first examine "'whether the officer's action was justified at its inception,'" Powell, 222 F.3d at 917 (quoting Terry, 392 U.S. at 20, 88 S. Ct. at 1879), which turns on whether the officers had a reasonable suspicion that the defendant had engaged, or was about to engage, in a crime, id. In the second part of the inquiry, determining whether the stop went too far and matured into arrest before there was probable cause, we consider "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" Id. (quoting Terry, 392 U.S. at 20, 88 S. Ct. at 1879).

8

## A.

The officers were allowed to stop Acosta if, under the totality of the circumstances, United States v. Sokolow, 490 U.S. 1, 7-8, 109 S. Ct. 1581, 1585-86 (1989), "from the collective knowledge of the officers involved in the stop," United States v. Williams, 876 F.2d 1521, 1524 (11th Cir. 1989), they had an objectively reasonable suspicion that Acosta had engaged, or was about to engage, in a crime, Powell, 222 F.3d at 917. "The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" Powell, 222 F.3d at 917 (quoting Terry, 392 U.S. at 27, 88 S. Ct. at 1883). Thus, "'[w]hile "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop.'" Jackson v. Sauls, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 123, 120 S. Ct. 673, 675-76 (2000)). It does not require officers to catch the suspect in a crime. Instead, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." United States v. Gordon, 231 F.3d 750, 754 (11th Cir. 2000) (citing Wardlow, 528 U.S. at 125-26, 120 S. Ct. at 677; Terry, 392 U.S. at 22-23, 88 S. Ct. at 1880-81).

In this case the officers had more than enough objectively reasonable suspicion that Acosta was involved in criminal activity. The undercover officer, who was in contact with the suspect, told the surveillance officers where the two were to meet and that the suspect would be driving a silver Nissan Xterra to the meeting site. At the designated time, the surveillance officers saw Acosta driving a silver Nissan Xterra at the meeting site. At the very moment that the undercover officer was talking on the phone with the suspect, Acosta was seen talking on his cell phone. When the undercover officer told the suspect over the telephone that the meeting had to be postponed, surveillance officers watched Acosta drive away. Finally, the next day when Acosta informed the undercover officer that he was on his way to the rescheduled money exchange, the surveillance officers saw Acosta preparing to depart in his car. Given those facts, the officers' suspicion that Acosta had engaged or was about to engage in the crime of money laundering was objectively reasonable.

**B.**

Acosta also contends that even if the initial stop was a valid Terry stop, it matured into an arrest without probable cause, so that all the evidence gathered after that maturation point is due to be suppressed because he was arrested without probable cause, and for the additional reason that he was questioned for a period of

10

time after being arrested before he was read his <u>Miranda</u> rights. Acosta's stop-became-an-arrest contention has to do with the second part of the <u>Terry</u> inquiry, which requires us to determine "'whether [the stop] was reasonably related in scope to the circumstances which justified the interference in the first place.'" <u>Sharpe</u>, 470 U.S. at 682, 105 S. Ct. at 1573 (quoting <u>Terry</u>, 392 U.S. at 20, 88 S. Ct. at 1879). There is a difference between an investigative stop of limited duration for which reasonable suspicion is enough, and a detention that amounts to an arrest for which probable cause is required. The difference is one of extent, with the line of demarcation resulting from the weighing of a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." <u>Dunaway v. New York</u>, 442 U.S. 200, 209, 99 S. Ct. 2248, 2255 (1979); <u>see also</u> <u>United States v. Puglisi</u>, 723 F.2d 779, 785 (11th Cir. 1984).

To assist us in more objectively drawing the line between a <u>Terry</u> stop and an arrest in an individual case, we apply four non-exclusive factors. These factors are: "'the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, the scope and intrusiveness of the detention, and the duration of the detention.'" <u>United States v. Gil</u>, 204 F.3d 1347,

11

1351 (11th Cir. 2000) (quoting United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988)); see also Sharpe, 470 U.S. at 685-86, 105 S. Ct. at 1575.

In analyzing the first factor, the law enforcement purposes served by the detention, we have stated that "the most important [consideration] 'is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.'" Gil, 204 F.3d at 1351 (quoting Hardy, 855 F.2d at 759). As we explained in our Hardy opinion:

> A Terry stop is justified to give the police an opportunity to engage in brief and nonintrusive investigation techniques, such as noncustodial questioning of the detained person. A Terry stop cannot be used as the basis of a "full search" that would normally be warranted only by the existence of probable cause, consent, or a valid arrest. Nor may the police use an investigative stop to subject a suspect to custodial interrogation that would ordinarily require formal arrest and Miranda warnings.

855 F.2d at 759 (citations and internal quotations omitted). Thus, we must determine whether these officers utilized "brief, minimally intrusive investigation technique[s]" appropriate under Terry. Id.

The officers questioned Acosta about what was in his car, asked him for permission to search the car, sought permission from Sade to search the apartment that he and Acosta had just left, briefly searched the apartment, returned to ask Acosta for permission to open a bag they found in the apartment, searched it, and

12

then placed Acosta under arrest. Because this series of acts was designed to lead to a quick and non-intrusive resolution of the officers' reasonable suspicions, the first factor weighs in favor of the legality of the stop.

Under the second factor we ask whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay. See Sharpe, 470 U.S. at 686-87, 105 S. Ct. at 1575-76; Hardy, 855 F.2d at 759-60. Nothing in the record indicates that the police were less than prompt in carrying out their on-the-scene investigation. Each investigatory act logically led to the next act which was done without delay.

Under the third factor we ask whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety. See Michigan v. Long, 463 U.S. 1032, 1047-48, 103 S. Ct. 3469, 3479-80 (1983); Pennsylvania v. Mimms, 434 U.S. 106, 110-11, 98 S. Ct. 330, 333 (1977) (per curiam). The Supreme Court has stated that officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous." Long, 463 U.S. at 1051, 103 S. Ct. at 3482 (1983). It follows, and our prior opinions confirm, that an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, United States v. Roper, 702 F.2d 984, 987-88 (11th Cir.

13

1983), handcuffs a suspect, United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989), orders a suspect to lie face down on the ground, Courson v. McMillian, 939 F.2d 1479, 1492-93 (11th Cir. 1991), or secures a suspect in the back of a patrol car, Gil, 204 F.3d at 1351. While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a Terry stop into a de facto arrest. Hastamorir, 881 F.2d at 1556.

Based on the nature of the officers' reasonable suspicion that Acosta was carrying a large amount of money in his car, the officers were justified in suspecting that he may have had a weapon to protect himself and the money. It was reasonable for one or more officers to draw a gun momentarily as Acosta exited his car, and for the officers to frisk Acosta for weapons. During the stop the officers prevented Acosta from returning to his car at least one time, but that was a reasonable precaution because the car had not been fully searched for weapons at that point.

It is not clear how long the officers kept Acosta's driver's license after obtaining it from him for identification purposes, but it was reasonable for the officer who checked Acosta's identity to retain his license during the short period while the identity check was being conducted. Although not clear from the record,

14

the officers may have taken and retained Acosta's keys during the stop, and it appears that his car was blocked-in by the officers' cars. Even if that happened, there is nothing to indicate Acosta asked the officers to move their cars, or to return his keys and license. Besides, the very nature of a Terry stop includes stopping a suspect from leaving. "[A]n investigatory stop is not an arrest despite the fact that a reasonable person would not believe he was free to leave." United States v. Blackman, 66 F.3d 1572, 1576 (11th Cir. 1995) (emphasis omitted). We conclude that the level of restraint imposed on Acosta was reasonably necessary to effect the stop and ensure the safety of the officers at the scene.

The fourth and final factor is whether the duration of the detention was reasonable. There is no rigid time limitation or bright line rule regarding the permissible duration of a Terry stop. See United States v. Place, 462 U.S. 696, 709-10, 103 S. Ct. 2637, 2645-46 (1983) (declining to adopt an "outside time limitation" for a permissible Terry stop); see also United States v. Purcell, 236 F.3d 1274, 1279 (11th Cir. 2001), cert. denied, 534 U.S. 830, 122 S. Ct. 73 (2001). The test is one of "common sense and ordinary human experience." Sharpe, 470 U.S. at 685, 105 S. Ct. 1575. In Sharpe, the Supreme Court explained that in determining whether a detention exceeds the outer boundary for a Terry stop, we must consider whether the police diligently pursued a means of investigation likely

to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. Sharpe, 470 U.S. at 686, 105 S. Ct. at 1575. From our prior discussion, it should be obvious that we believe the officers in this case did diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

We also believe that the total amount of time Acosta was detained was reasonable in relation to the purpose of the stop. Although the record is not entirely clear, it appears that Acosta was first stopped at approximately 11:05 a.m. and that he was arrested sometime after 11:25 a.m., at which time he signed the consent form permitting a search of his vehicle. Acosta claims that he was detained at least thirty minutes prior to his formal arrest, but even if we take that as given the result is still the same. Thirty minutes duration is not beyond the pale of reasonableness for Terry stops, as our prior decisions make clear. In Gil, a drug-conspiracy case, we rejected the defendant's contention that because she was detained for approximately seventy-five minutes in handcuffs in the back of a patrol car her detention exceeded the duration of an allowable Terry stop and ripened into a full scale arrest. 204 F.3d at 1350. In Hardy, a drug-conspiracy case, we approved a Terry stop of fifty minutes duration. 855 F.2d at 761. By contrast, in Place, a drug possession case, the Supreme Court noted that, although

16

it was unwilling to set an absolute time limit, the ninety minute detention of the suspect's luggage in that case was too long for a <u>Terry</u> stop. <u>Place</u>, 462 U.S. at 709-10, 103 S. Ct. at 2645-46. Considering the circumstances, and in light of existing precedent, thirty minutes was a reasonable duration for this <u>Terry</u> stop.

Having concluded that the officers had reasonable suspicion to justify a <u>Terry</u> stop, and that the stop did not mature into <u>de facto</u> arrest before there was probable cause, we turn to Acosta's next attack on the admissibility of the evidence obtained as a result of the stop.

**IV.**

Acosta contends that he was in "custody" for <u>Miranda</u> purposes from the time he was first stopped and therefore the officers should have read him his rights at that time instead of waiting until after they told him he was under arrest. The district court did not address this issue in its order, nor did the magistrate judge in his corrected report and recommendation. We do address the issue, because Acosta raised it in his motion to suppress and in his briefs to us.

The right to <u>Miranda</u> warnings attaches when custodial interrogation begins. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966); <u>Dickerson v. United States</u>, 530 U.S. 428, 435, 120 S. Ct. 2326, 2331 (2000). Normally courts apply a two-part test to determine whether a suspect is in custody

17

for Miranda purposes: "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 465 (1995). As we have already discussed, a suspect who is detained during a Terry stop is not free to leave from the beginning of the stop until it ends. If we applied the general Miranda custodial test literally to Terry stops, the result would be that Miranda warnings are required before any questioning could occur during any Terry stop.

The Supreme Court in Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138 (1984), has indicated to the contrary. In that decision, the Court explained that the non-threatening nature of a Terry stop is the reason for "the absence of any suggestion in [the Court's] opinions that Terry stops are subject to the dictates of Miranda." Id. at 440, 104 S. Ct. at 3150 (dictum). The holding of Berkemer is more limited than the implications of that language, because the case involved a traffic stop and not a Terry stop of a suspected felon. Nonetheless, the Berkemer decision and opinion does provide guidance on the issue of when Miranda warnings may be required before interrogation during a Terry stop.

The guidance the Berkemer decision provides stems from the fact that traffic stops, like Terry stops generally, are indeed stops. A reasonable person knows that

18

he is not free to drive away from a traffic stop until it is completed, just as a reasonable person knows that he is not free to walk away from a <u>Terry</u> stop until it is over. If the lack of freedom to leave were decisive, which is to say if every phrase in the <u>Miranda</u> opinion is to be applied literally, then all traffic stops as well as all <u>Terry</u> stops generally would be subject to the requirements of that decision. <u>Berkemer</u> establishes that they are not.

The Court explained in <u>Berkemer</u> that it "decline[d] to accord talismanic power to the phrase in the <u>Miranda</u> opinion," that "<u>Miranda</u> by its terms applies whenever 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" <u>Berkemer</u>, 468 U.S. at 435-37, 104 S. Ct. at 3148 (quoting <u>Miranda</u>, 384 U.S. at 444, 86 S. Ct. at 1612). Instead of asking whether a suspect reasonably would feel free to leave, the <u>Berkemer</u> Court instead said the question should be "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." <u>Id.</u> at 437, 104 S. Ct. at 3149. Put another way, suspects "subjected to restraints comparable to those associated with a formal arrest," must be advised of their <u>Miranda</u> rights. <u>Id.</u> at 441, 104 S. Ct. at 3151; <u>see also</u> <u>California v. Beheler</u>, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520 (1983) (per curiam).

19

The Supreme Court recognized in Berkemer that a driver detained during a typical traffic stop is not free to leave, and is therefore "seiz[ed] within the meaning of [the Fourth] Amendmen[t]." Berkemer, 468 U.S. at 436-37, 104 S. Ct. at 3148. However, the Court recognized two key factors which, in the context of a traffic stop, mitigate the pressures upon a detained person so that his ability to exercise his privilege against self incrimination is not so impaired that he need be warned of his constitutional rights under Miranda. First, "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief." Id. at 437, 104 S. Ct. at 3149. The Court distinguished traffic stops, which ordinarily "last only a few minutes," id., from a "stationhouse interrogation, which frequently is prolonged, and in which the detainee often is aware that questioning will continue until he provides his interrogators the answers they seek." Id. at 437-38, 104 S. Ct. at 3149. The Court explained that the brief and typically spontaneous nature of the usual traffic stop:

> reduces the danger that the driver through subterfuge will be made to incriminate himself. One of the investigative techniques that Miranda was designed to guard against was the use by police of various kinds of trickery--such as "Mutt and Jeff" routines--to elicit confessions from suspects. A police officer who stops a suspect on the highway has little chance to develop or implement a plan of this sort.

Id. at 438 n.27, 104 S. Ct. at 3149 n.27 (internal citations omitted).

20

The second factor associated with a traffic stop that the Berkemer Court recognized as reducing the pressure to respond to incriminating questions is that most traffic detainees would not "feel[] completely at the mercy of the police." Id. at 438, 104 S. Ct. at 3149. The Court recognized that the inherent authority of armed police officers "exert[s] some pressure on the detainee to respond to questions," id., but the Court concluded that this inherent authority was more than offset by other aspects of such a stop:

> Passersby, on foot or in other cars, witness the interaction of officer and motorist. This exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse. The fact that the detained motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. In short, the atmosphere surrounding an ordinary traffic stop is substantially less "police dominated" than that surrounding the kinds of interrogation at issue in Miranda itself . . . .

Id. at 438-39, 104 S. Ct. at 3149.

The Tenth Circuit in United States v. Perdue, 8 F.3d 1455, 1466 (10th Cir. 1993), took heed of the Supreme Court's discussion in Berkemer and applied it to Terry stops. In the Perdue case the suspect, along with his pregnant fiancee, were stopped in "an isolated, rural area not subject to the public's scrutiny," he was forced or ordered to the ground, and as the officers kept their guns drawn on him and his fiancee, he was questioned while lying face down, as police helicopters

21

circled overhead. Id. at 1464-66. Aggressive physical force and handcuffs may have been used as well. Id. at 1458-59, 1464. The Tenth Circuit determined that all of the circumstances surrounding the detention and questioning would lead a reasonable person in the detainee's position to feel he was completely at the mercy of the police. Id. at 1466 (citing Berkemer, 468 U.S. at 437, 104 S. Ct. at 3149). As a result, even though the stop was within the bounds of Terry, the Court decided that it was the kind of "highly intrusive, 'non-arrest' encounter[]" in which the Berkemer Court had indicated Miranda warnings might be required. Id.

The case we have before us is different from the Purdue case. Instead of being detained in a remote area far from public scrutiny, Acosta was stopped in the parking lot of an apartment building in broad daylight. The officers' actions were visible to anyone in the area who chose to look. Instead of being questioned at gunpoint, Acosta was questioned after any weapons were quickly put back into their holsters. Instead of being forced to lie face down, Acosta remained standing the entire time. No physical force was used against him. He was not even handcuffed. He was not even placed in a police car at the time. He was assured that he was not under arrest. And, of course, there was no pregnant fiancee with guns pointed at her, and no police helicopters circling overhead.

22

The restraint to which Acosta was subjected during the <u>Terry</u> stop is the minimal amount necessary for such a stop or close to it. The stop did not involve the type of "highly intrusive" coercive atmosphere that may require <u>Miranda</u> warnings even before a formal arrest is made. The totality of the circumstances were such that a reasonable person in Acosta's position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else. No <u>Miranda</u> warnings were required at the time.

## V.

Acosta contends that the district court erred in denying his motion to suppress the heroin found in the duffle-bag that was inside Sade's apartment. Neither the district court in its order, nor the magistrate judge in his corrected report and recommendation, discussed the search of the duffle-bag. At the conclusion of the suppression hearing, however, the magistrate judge concluded that the search of the bag was justified on the basis of the consent given by Sade for the officers to search his entire apartment. We need not reach the issue of whether Sade's consent to the search of his apartment was enough to relinquish Acosta's rights as to the duffle-bag contained in the apartment, because the

23

undisputed evidence in the record shows that Acosta himself consented specifically to the search of the bag.

Officer Sallick testified at the suppression hearing that when asked for the key and consent to search the duffle-bag, Acosta "said, 'yes[,] [o]f course,' reached into his pocket and produced a set of keys and gave them to me." There was no contrary testimony or evidence at all, and no reason to believe that the magistrate judge or district court could have had any basis for not crediting Officer Sallick's undisputed testimony. We "do not insist that trial courts make factual findings directly addressing each issue that a litigant raises," Zack v. Comm'r, 291 F.3d 407, 412 (6th Cir. 2002), but instead adhere to the proposition that "findings should be construed liberally and found to be in consonance with the judgment, so long as that judgment is supported by evidence in the record," Gilbert v. Sterrett, 509 F.2d 1389, 1393 (5th Cir. 1975) (citation and quotation marks omitted).[1] The corrected report and recommendation, as adopted by the district court, did find as a fact that "statements made by the defendant prior to his arrest were made freely and voluntarily." Acosta's statement consenting to a search of the duffle-bag was made before his arrest.

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

"A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'" United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S. Ct. 2041, 2047 (1973)). Voluntariness is a question of fact based on the totality of the circumstances. Id. (citation omitted). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)). As we stated in Blake, determining whether consent was "voluntary is not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis." 888 F.2d at 798 (citing Schneckloth, 412 U.S. at 224-25, 93 S. Ct. at 2046).

Applying these principles, and construing the record in the light most favorable to the judgment, we conclude that Acosta did consent to the search of the duffle-bag, and his consent was voluntary. The district court did not err in refusing to suppress the results of that search.

**VI.**

25

We turn now to the final issue: whether the officer who questioned Acosta at the United States Customs Service HIDTA headquarters, violated his rights by continuing the questioning after Acosta had arguably invoked his rights. The applicable law is well settled. When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end, and if he expresses a desire to consult with an attorney, the questioning must cease until one is provided for him. Miranda, 384 U.S. at 473-74, 86 S. Ct. at 1627-28; see also Coleman v. Singletary, 30 F.3d 1420, 1423 (11th Cir. 1994).

However, it is also well settled that law enforcement officers have no duty to stop an interrogation where the suspect's invocation of either of those rights is equivocal. The Supreme Court has held that: "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." Davis v. United States, 512 U.S. 452, 461-62, 114 S. Ct. 2350, 2356 (1994). And we have held that: "[T]he same rule [applies] to a suspect's ambiguous or equivocal references to the right to cut off questioning as to the right to counsel." Coleman, 30 F.3d at 1424. "A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have

26

no duty to clarify the suspect's intent, and they may proceed with the interrogation." Id.

This case is one in which the arrestee made contradictory statements about whether he wished to invoke his rights or was willing to continue answering questions. Acosta was at the United States Customs Service HIDTA headquarters being questioned after he was arrested. He already had been read his rights once and apparently had not indicated, ambiguously or otherwise, that he wished to invoke them. Agent Ocasio, was doing the questioning (Agent Miles was also present). After Acosta had already made a number of incriminating statements, Agent Ocasio decided to back up Acosta's earlier oral waiver of rights with a written one. A written waiver form was brought in, and after each statement of a Miranda right was read to Acosta, he was asked whether he understood; he acknowledged that he did by replying "Okay," or "Exactly," or "Perfectly."[2]

But Acosta refused to sign the waiver form. He said, "that waiver (UI) I'm not going to sign it." Ocasio replied: "Huh? No. if you don't want to sign it. I'm not telling you that you have to sign it, (UI)." To that, Acosta responded: "No, no, no, I'll sign this for you that those are my rights." Ocasio then had Acosta read out

_____

[2] The facts we recount in connection with this issue are either drawn straight from the district court's findings, which it entered after conducting an evidentiary hearing, or they are lifted from the transcript of the interrogation. The accuracy of that transcript is uncontested, and it formed the basis for most of the district court's findings.

27

loud the entire form stating all of his rights and had him initial each part to indicate that he understood his rights.

After Acosta had finished reading out loud the statement of his rights and initialing the form to indicate that he understood them, the following transpired:

OCASIO:     Now, uh... do you want to waive your rights or not?

ACOSTA:     No, I'm not going to waive my rights.

OCASIO:     Okay.

ACOSTA:     I can collaborate, I can talk with you now...

OCASIO:     Do you want to talk to us?

ACOSTA:     I'll talk with you... (UI) my interrogation...

OCASIO:     You know what it means to waive your rights, right?  Do you understand what that means?

ACOSTA:     No, I understand what the rights are. What happens is that, maybe...

OCASIO:     Well, (UI), what, what it means...

ACOSTA:     ...(UI)...

OCASIO:     ...to waive, what, the word waive does not mean that you are going to waive all your rights com... completely...

ACOSTA:     I understand, but that...

28

OCASIO: ...because as you read here, what that means, uh, that is, what it means is that if, if you're talking to us and it comes to a point where you do not want to talk any more, you can stop, you can stop talking, and not say anything else, okay?

ACOSTA: No, I mean, I'll tell you something, I am willing to talk whatever, why?

(ellipses as found in original)

Agent Ocasio then explained to Acosta that he wanted him to understand what he was reading and not get confused. Acosta replied that he understood his rights but wanted to "avoid any misunderstandings in the future." Acosta attempted to explain:

> When I tell you, "I waive my rights..." I can waive any right that any... uh, any right that you tell me. "Oh, what is this?" "No, you, you signed here. You don't have rights to anything."

The conversation continued and Acosta acknowledged the drugs that had been found in his possession.

Agent Ocasio then returned to the question of whether Acosta would sign the form:

OCASIO: Right? Okay. What I'm telling you is the following, okay. Whether you sign this or not sign this, and you're

29

going to cooperate with us and you're going to talk with us in any, of, you know, you have to understand that if you're going to talk with us we have to know that, we wa... we want to say that you are talking with us today, on this day.

ACOSTA: In other words, this is being recorded. In this recording I tell you...

OCASIO: Uh-hum.

ACOSTA: ...I am going to cooperate with you at this moment, right at this very instant. To me ev... everything you need, I can answer all your questions without the need to sign that I waive my rights...

OCASIO: Okay.

ACOSTA: ...because I am not going to waive my rights.

OCASIO: This thing is running, right?

MILES: Yes.

OCASIO: Okay, okay, well, that is all I want you to understand.

ACOSTA: Right, I understand it perfectly.

OCASIO: What I'm going to do here is that I, look... He says he agrees, he's going to cooperate with us, his, he knows this is being recorded on tape. He says that, uh, but he's not going to

sign the, the... the bottom of the form here, you know?  So I told him that's fine, you know?

MILES:        Okay.

OCASIO:      That's what he wants, it's fine.

MILES:        Okay.

OCASIO:      That's not a problem with us.

MILES:        Yeah.  Just put, uh...

OCASIO:      So I'm going to make a note down here...

MILES:        ...yeah, just put it's, uh, "Verbally agrees to cooperate.  Will not sign."

OCASIO:      Yeah.

MILES:        Just put the date and time in the box where they belong there, though.

(ellipses as found in original)  The questioning then continued without any further reference to the waiver of rights.

The one thing that is clear from all of this is that Acosta refused to sign a written waiver of his rights.  However, the Supreme Court's decision in <u>North Carolina v. Butler</u>, 441 U.S. 369, 99 S. Ct. 1755 (1979), and a number of our decisions, establish that an arrestee's refusal to sign a waiver of rights form is not enough to constitute an invocation of rights.  <u>See</u> <u>Jones v. Dugger</u>, 928 F.2d 1020,

31

1027 (11th Cir. 1991) ("A refusal to sign a written waiver form does not conclusively indicate that the suspect wishes to remain silent."); United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) (the defendant's "refusal to sign the waiver form did not render subsequent questioning improper"); United States v. Eirin, 778 F.2d 722, 728 (11th Cir. 1987) ("Merely refusing to sign a waiver of rights form without an attorney's guidance is not synonymous with an affirmative request for assistance of counsel.").

We have to go beyond Acosta's refusal to sign the written form in order to ascertain whether he unequivocally and unambiguously invoked his rights. The closest Acosta came to doing that was when he was asked whether he wanted to waive his rights and said: "No, I'm not going to waive my rights." If that had been all Acosta had said, it might well have been clear enough, but when Agent Ocasio assented by simply uttering "Okay," Acosta volunteered: "I can collaborate, I can talk with you now..." (ellipses as found in original) When Ocasio sought to clarify those two inconsistent statements, as he had the right to do, by asking if Acosta wanted to talk with the officers, Acosta said he would. Typical of the ambiguity in what Acosta said about whether he wanted to talk or waive his rights is his statement that: "I am going to cooperate with you at this moment, right at this very instant. To me ev... everything you need, I can answer all your questions without

32

the need to sign that I waive my rights [] because I am not going to waive my rights." (ellipsis as found in original)

Relying primarily upon the transcript of the interrogation, but also considering the testimony of Officer Ocasio at the evidentiary hearing on this issue, the district court found that Acosta had waived his Miranda rights without prodding by the officers, indeed that there was "a complete absence of any coercive conduct on the part of the officers." It noted Officer Ocasio's testimony giving his impression that Acosta had been "hung up" on one particular Spanish word and had refused to sign the waiver because he thought that if he signed, in Ocasio's words, "he wouldn't have rights to anything."

However, the district court also correctly observed that the test is an objective one and "asks, would a reasonable, native Spanish-speaking officer in Agent Ocasio's place have understood Acosta's statements as invoking his right to silence, or his right to an attorney?" The court concluded that, "when considered in the appropriate context," a reasonable officer in Ocasio's position would not have interpreted Acosta's statements as expressing a desire to invoke his right to remain silent. The district court also appears to have adopted Officer Ocasio's interpretation of Acosta's statements, because in recounting the totality of the circumstances the court parenthetically stated that Acosta "refused to sign the

Rights Form out of concern that he would be waiving rights not otherwise identified in the form."

Officer Ocasio's impression about the statements Acosta made in connection with his refusal to sign the waiver, which the district court adopted, may be accurate. Or the truth may be that Acosta was willing to talk with the officers and answer their questions, and do so without an attorney being present, but he didn't want to sign a written waiver of his rights because he thought that a signed waiver might be irrevocable. Either of those two constructions are at least as plausible as one that views Acosta's statements as indicating that he did not wish to talk to the officers either then or ever without an attorney present. However, it matters not which interpretation of Acosta's seemingly self-contradictory statements is the best one. What matters is that there are competing reasonable interpretations of what Acosta meant, and they point in different directions. We have noted before, albeit in a different context, that the existence of "two reasonable, competing interpretations" is "the very definition of ambiguity." Doe v. Bush, 261 F.3d 1037, 1062 (11th Cir. 2001). The existence of three plausible, differing interpretations instead of two only deepens the ambiguity. Because Acosta did not unambiguously and unequivocally invoke his right to remain silent or his right to

34

counsel while being questioned, the district court did not err in denying his motion to suppress.

**AFFIRMED.**