[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 21, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-15625
Non-Argument Calendar

_____

D. C. Docket No. 05-00024-CR-J-20-HTS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CRAIG LEMAR WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 21, 2006)**

Before BLACK, BARKETT and HULL, Circuit Judges.

PER CURIAM:

Craig Lemar Williams ("Williams") appeals his conviction for possession of

firearms and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). Specifically, Williams challenges the district court's denial of his motion to suppress. After review, we affirm Williams's conviction.

## I. Background

### A. Evidentiary Hearing

We first recount the testimony at the evidentiary hearing on the motion to suppress. Around 10:00 or 11:00 p.m. on November 24, 2004, Officer Prinzi ("Prinzi"), a member of the Jacksonville, Florida Sheriff's Office ("JSO"), was dispatched to a boarding house to investigate a disturbance complaint. Upon arrival, Prinzi interviewed James Fisher ("Fisher"), who told Prinzi that Williams had been firing a shotgun out of one of the windows. Fisher identified Williams by name and described him to Prinzi as a black male. Prinzi instructed Fisher to call the JSO in the event that Williams returned.

A few hours later, Prinzi heard over his dispatch radio that Officer Scott ("Scott") had been dispatched to the same boarding house to investigate a complaint that Williams had returned and begun firing his shotgun again. Prinzi then radioed dispatch and asked to be sent as backup for Scott, because he had been to the scene earlier and knew that there were "officer safety issues" involved. Prinzi and Scott then met to coordinate their arrival at the scene because of the

2

possibility that "a suspect [might have been] . . . there armed" and because they did not know "what the situation might be." During this meeting, Prinzi told Scott about Fisher's previous allegations: that the suspect was Craig Williams and that Williams was "a black male . . . possibly armed and dangerous."

Prinzi and Scott then walked to the boarding house, with Prinzi walking behind Scott as backup. They arrived at the scene at approximately 12:20 a.m. and encountered Williams on the sidewalk. Prinzi observed Scott converse with Williams. Based on the information obtained from Prinzi, Scott was certain as soon as he encountered Williams that Williams was the individual accused of discharging a firearm. Scott detained Williams, and within five minutes, Scott handcuffed him and placed him in the back of his patrol car. Shortly after being placed in the patrol car, Williams confirmed his identity to Scott.

Thus, while Williams was in the patrol car, the officers knew: (1) that the JSO had received two calls about a black male named Williams discharging a shotgun at the boarding house; and (2) that they had detained, shortly after arriving at the boarding house, a black male who had confirmed his name was Williams.

After detaining Williams, Prinzi and Scott proceeded to investigate the two disturbance complaints against Williams. They interviewed (1) Fisher, who stated that Williams had returned to the boarding house and fired the shotgun several

times in the side parking lot, and (2) James Sykes ("Sykes"), who corroborated Fisher's statements. According to Fisher, Williams, after discharging the shotgun, placed the weapon in the trunk of his car. Fisher described Williams's vehicle as a white car parked on a side street.

After speaking with Fisher, Prinzi examined the side parking lot, where he located two spent shotgun shells. Prinzi then observed a white car in the parking lot next to the boarding house. Prinzi asked Fisher if that was Williams's vehicle, and Fisher said that it was. Prinzi subsequently ran a computer check on that vehicle's license plate, and confirmed that the vehicle belonged to Williams. Prinzi then returned to the vehicle, and, using his flashlight from the outside of the vehicle to illuminate the inside of the vehicle, observed a live shotgun round that, according to Prinzi, "looked just like the two spent rounds that were on the ground outside in the parking lot." At this time, Prinzi did not go inside the car.

Prinzi then ran a background check on Williams, and discovered that Williams was a convicted murder. Prinzi conveyed that information to Scott, and at approximately 1:20 a.m., Williams was placed under arrest for possession of ammunition by a convicted felon. Thus, at the time of the arrest, the officers had confirmed that Williams was a convicted felon, confirmed that the white car was registered to Williams, and seen the live ammunition in Williams's vehicle.

4

After placing Williams under arrest, Scott and Prinzi then searched Williams's vehicle. Prinzi and Scott opened the unlocked driver's side door and collected the live ammunition round. Prinzi and Scott then searched the trunk, where they located a shotgun and a pistol, both of which Williams claimed belonged to a friend.

### B.      Motion to Suppress

Williams filed a motion to suppress the ammunition and firearms, as well as certain post-detention statements. The district court denied the suppression motion. Williams waived his right to a jury trial and was tried in a bench trial. The district court convicted Williams of possession of a firearm and ammunition by a convicted felon, and sentenced him to 180 months' imprisonment.

Williams appeals only the district court's denial of his suppression motion.[1]

## II.      Discussion

### A.      Detention

Williams first argues that he was unlawfully detained by Scott in the first instance and that his initial detention was unlawfully converted into a de facto arrest.

---

[1]We review a district court's denial of a suppression motion under a mixed standard of review. The district court's findings of fact are reviewed for clear error, while the district court's legal conclusions are reviewed de novo. United States v. Gil, 204 F.3d 1347, 1350 (11th Cir. 2000).

Under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), and its progeny, a police officer may briefly detain an individual if he has a reasonable and articulable suspicion that a person has committed or is about to commit a crime. See United States v. Hastamorir, 881 F.2d 1551, 1556 (11th Cir. 1989). In Terry, the Supreme Court "carved out a narrow exception to the [Fourth Amendment] probable cause requirement, allowing police to detain a suspect based on reasonable suspicion for the purpose of an investigative detention." Id. (explaining Terry). Reasonable suspicion is determined by the totality of the circumstances. See United States v. Lee, 68 F.3d 1267, 1271 (11th Cir. 1995); Hastamorir, 881 F.2d at 1556.

Further, officers may handcuff or otherwise restrain a suspect during an investigatory stop when such action is reasonable under the circumstances to protect themselves or the public, or to maintain the status quo. See Hastamorir, 881 F.2d at 1556; United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985); see also United States v. Gil, 204 F.3d 1347, 1350-51 (11th Cir. 2000). To determine whether the manner and length of an investigatory detention during a Terry stop was reasonable, we "apply four non-exclusive factors." United States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004). The factors are: (1) the purpose of the detention; (2) the diligence of the police in conducting the investigation; (3) the

scope and intrusiveness of the detention; and (4) the duration of the detention.  Id.

Here, Scott had reasonable suspicion to detain Williams initially under Terry.  Prior to Scott's arrival at the boarding house, Prinzi had described Williams to Scott and conveyed Fisher's prior allegations about Williams's earlier discharge of a firearm.  Moreover, Scott was aware of Fisher's second call to the JSO dispatcher, advising that Williams had returned to the boarding house and resumed firing his shotgun.  As he approached the boarding house, Scott immediately encountered an individual whom he identified as Williams.  Given these circumstances; that it was late at night; and that Scott and Prinzi believed Williams to be armed and dangerous, Scott's initial detention of Williams was supported by reasonable suspicion and was a valid Terry stop.

Moreover, given the nature of the two complaints that night—that Williams had discharged a firearm, left the scene, and then returned to the scene and discharged a firearm again—we conclude that the officers' actions in immediately securing Williams during the initial Terry stop (by handcuffing Williams and placing him in Scott's patrol car) were reasonable to protect the officers and the public and to secure Williams from leaving again while the officers investigated further.  Specifically, applying the first Acosta factor, Williams's detention was for a valid purpose: to secure a potentially armed and dangerous suspect involved in

7

two shooting incidents while investigating the shootings themselves. Although a pat-down search of Williams revealed no weapons on his person, Williams was nevertheless the sole suspect in two shooting incidents that had occurred at the very scene where he was detained. Moreover, Williams had left the scene after the first shooting incident, and soon after he was placed in the patrol car, he confirmed his identity to the officers. It was thus reasonable for the officers to have secured Williams while they canvassed the scene. Williams's detention allowed the officers "to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly," by, among other things, quickly canvassing the scene for physical evidence and speaking to Fisher and Sykes. Gil, 204 F.3d at 1351 (concluding that the detention of a suspect in order to prevent her from jeopardizing the investigation of her residence was for a valid purpose). Accordingly, the detention of Williams was undertaken for a valid purpose.

As for the second Acosta factor, the diligence of the police investigation, we conclude that Scott and Prinzi were diligent in their investigation. In approximately one hour, the officers investigated Fisher's allegations to the dispatcher by interviewing Fisher and Sykes; by examining the area where Fisher alleged Williams had been firing his gun; by collecting shotgun shells from that area; by finding and examining Williams's car; and by confirming Williams's

8

ownership of the car and determining Williams's prior conviction for murder. Certainly, the officers' methods were "carried out without unnecessary delay." Acosta, 363 F.3d at 1146.

As for the third and fourth Acosta factors, we observe that handcuffing and placement in a patrol car is a severe form of intrusion. However, in this unusual case, there were reports that Williams had discharged a shotgun at a boarding house residence, had left the scene once, and had come back and fired a shotgun again. Thus, in order to maintain the safety of the officers, the public, and the ongoing investigation, the officers secured Williams for approximately one hour in the patrol car while they investigated. Under and limited to the specific factual circumstances of this case, we conclude that Williams's hour-long detention in the patrol car was reasonable.[2] See Gil, 204 F.3d at 1351; see also United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005).

## B. Arrest

As for Williams's subsequent, formal arrest for possession of ammunition by a convicted felon, there was probable cause for that arrest. During the officers' investigation, Prinzi discovered two shotgun shells in the location where,

_____

[2]Although we need not decide the issue because we hold that the manner and length of the Terry stop was reasonable under the specific facts presented here, it may be that there was also probable cause to arrest Williams for discharge of his firearm as soon as Williams confirmed his identity to the officers, based on Fisher's allegations.

9

according to Fisher, Williams had been firing a shotgun, and then saw (without entering Williams's car) that Williams's car contained a live shotgun shell that "looked just like" the other two shells. Prinzi also learned during the investigation that Williams was a convicted murderer, and confirmed that the white car containing the live ammunition did in fact belong to Williams. Moreover, keys to the car were located in Williams's pocket after he was detained. Thus, the officers had probable cause to believe that Williams had possessed the live shotgun shell in his car that night, and Williams's possession of the shell, along with his prior felony conviction, gave the officers probable cause to arrest him for illegal possession of the shell.

## C.   Search of Car

Finally, we conclude that the officers' warrantless search of Williams's car, including the trunk, was valid, under the so-called "automobile exception" to the Fourth Amendment's warrant requirement. See Maryland v. Dyson, 527 U.S. 465, 466, 119 S. Ct. 2013, 2014 (1999). Under the automobile exception, warrantless searches of vehicles are permitted "'[i]f a car is readily mobile and probable cause exists to believe it contains contraband . . . .'" Id. at 467, 119 S. Ct. at 2014 (citation omitted) (emphasis added). Williams does not dispute that the car was

10

readily mobile,[3] but argues that the officers lacked probable cause.  Here, there was probable cause to believe that the car contained contraband, based on Fisher's statement that he observed Williams placing a shotgun in the car's trunk and the live shotgun shell seen by Prinzi through the car's window.  Accordingly, the automobile exception applies here, and the search of Williams's car was valid.[4]

## III.    Conclusion

For the foregoing reasons, we affirm the district court's denial of Williams's motion to suppress and affirm Williams's conviction.

**AFFIRMED.**

---

[3]It is well-established that a vehicle need only be "operational" in order to satisfy this requirement.  United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003); see also Dyson, 527 U.S. at 467, 119 S. Ct. at 2014 (no separate finding of any exigency is required to search readily mobile car if there is probable cause to believe the car contains contraband).

[4]Because the automobile exception applies here, we need not address Williams's arguments that the search of the car was an invalid search incident to his arrest or an invalid "exigent circumstances" search.

11