[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-13953
Non-Argument Calendar
_____

D.C. Docket No. 5:14-cr-00028-RH-5


UNITED STATES OF AMERICA,

                                                        Plaintiff-Appellee,

versus

ANASTACIO MENDOZA,

                                                        Defendant-Appellant.


_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(August 9, 2016)

Before WILLIAM PRYOR, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Anastacio Mendoza appeals the district court's denial of his motion to suppress evidence.  Mendoza pleaded guilty to and was convicted of conspiracy to possess with intent to distribute more than 50 grams of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846.  On appeal, Mendoza argues that the district court erred by denying his motion to suppress because: (1) the Drug Enforcement Agency ("DEA") agents did not have reasonable suspicion to justify an investigative stop; and (2) even if they did, the investigative stop matured into a de facto arrest before the agents had probable cause.  After careful consideration, we reject both contentions and affirm.

## I.

On September 17, 2014, DEA agents arrested a man named John Love with 4 kilograms of methamphetamine and a loaded handgun in his pocket.  Love cooperated with authorities and said that he had recently made ten drug runs between Atlanta, Georgia, and Panama City Beach, Florida.  He told DEA agents about a methamphetamine-distribution conspiracy organized by a man in Mexico known as "Carlos."  Love would typically call or text message Carlos to arrange a drug pickup, and then Love would travel to Atlanta to meet with one or two men he identified as "Mexican" at a location they coordinated by phone.  A woman would sometimes speak with Love on the phone to clarify the pickup location.  At

2

the most recent pickup, Love had observed the two men driving a white Ford Expedition.

Under the direction of DEA agents, Love arranged a controlled drug buy. He contacted Carlos on September 17 to set up a purchase of 4 to 5 kilograms of methamphetamine, to be delivered by courier. Carlos agreed to send couriers to meet Love at the InTown Suites in Dothan, Alabama, on the morning of September 21.[1] Carlos described the couriers as "two Mexicans," but the DEA agents did not know whether one might be a woman or what car they would be driving.

The DEA agents, posing as Love, began communicating directly with the couriers in the minutes leading up to the drug buy. The couriers got lost on their way to the hotel, so the agents gave them detailed directions and were able to figure out that the couriers were traveling southbound on Ross Clark Circle. At 11:33 a.m., the DEA agents received a text message from the couriers reading, "I see it." At the same time, they observed a maroon Chevrolet Trailblazer (in which Mendoza was a passenger) drive past the hotel heading south on Ross Clark Circle, do a U-turn, and head toward the hotel. The DEA agents then received a text message asking, "What room?" They replied "Room 138" and told the couriers to drive around the right side of the hotel. The Trailblazer drove to the right side of the hotel and began cruising through the parking lot. The agents observed a

---

[1] The DEA agents took over communicating with Carlos and his associates (via text message) after Love was incarcerated.

3

Hispanic man and a Hispanic woman, looking toward the hotel as if at room numbers. The agents also saw that the Trailblazer had Georgia plates registered in Fulton County, which includes much of Atlanta. The Trailblazer pulled into a parking spot in front of Room 136, next to 138. DEA agent Brian Lammers, who was on the scene, testified that he believed the parking spot in front of Room 138 was occupied when the Trailblazer pulled in, but he couldn't be sure.

Once the Trailblazer parked, Agent Lammers pulled his vehicle forward and blocked the Trailblazer from the rear. DEA agents ordered Mendoza and the woman, Carmen Silva, out of the Trailblazer and handcuffed them. Agent Lammers testified that Mendoza and Silva were handcuffed for officer safety, because they were believed to be transporting a large quantity of drugs and their purported co-conspirator, Love, had recently been arrested carrying a loaded handgun. DEA agents also performed pat-downs and gave Miranda warnings[2] to Mendoza and Silva. The agents then asked Mendoza and Silva for consent to search the vehicle, but both refused. Finally, the agents deployed a drug dog, which alerted positive for drugs in the Trailblazer. The agents searched the vehicle and seized 4.6 kilograms of 97.5 percent pure methamphetamine. From the time DEA agents received the "I see it" text message to the time they deployed the drug dog, approximately ten minutes elapsed.

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

II.

"On a district court's denial of a motion to suppress, we review its findings of fact only for clear error and its application of law to those facts de novo." United States v. Acosta, 363 F.3d 1141, 1144 (11th Cir. 2004). The facts should be construed in the light most favorable to the prevailing party—here, the government. United States v. Mathis, 767 F.3d 1264, 1274–75 (11th Cir. 2014) (per curiam).

In appropriate circumstances, the Fourth Amendment permits a law enforcement agent to "approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880 (1968). We ask two questions when deciding whether such an investigative stop was reasonable: (1) whether the agent's initial action was justified by reasonable suspicion; and (2) whether the stop matured into a de facto arrest because it was no longer reasonably related to the circumstances that created reasonable suspicion. Acosta, 363 F.3d at 1144–45. Mendoza challenges the district court's treatment of both questions.

For the first question, "reasonable suspicion" means "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Navarette v. California, __ U.S. __, __, 134 S. Ct. 1683, 1687 (2014) (quotation omitted). The reasonable suspicion standard requires less than probable cause and

"considerably less" than a preponderance of the evidence. Id. (quotation omitted). But it does require more than an "inchoate and unparticularized suspicion or hunch." Terry, 392 U.S. at 27, 88 S. Ct. at 1883 (alteration adopted). In applying this standard, courts must look to the totality of the circumstances rather than considering individual facts in isolation; even where each fact alone can be innocently explained, the cumulative information may give rise to reasonable suspicion. United States v. Arvizu, 534 U.S. 266, 273, 277–78, 122 S. Ct. 744, 750, 753 (2002). Indeed, reasonable suspicion "need not rule out the possibility of innocent conduct." Id.

The second question asks whether the investigative stop became a de facto arrest before the agents had probable cause. See Acosta, 363 F.3d at 1145. We consider four non-exclusive factors in answering this question: (1) the purpose of the stop; (2) the diligence with which the agents pursued their investigation; (3) the scope and intrusiveness of the stop; and (4) the duration of the stop. Id. at 1146. The first factor turns on whether the agents "pursue[d] a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." Id. (quotation omitted). The second factor looks at whether the agents carried out their investigation "without unnecessary delay." Id. The third factor asks whether the stop was more intrusive than necessary to ensure the agents' safety. Id. The final factor is whether the stop took too long. Id. at 1147.

6

III.

A.    Reasonable Suspicion

Viewing the evidence in the light most favorable to the government, we conclude that the DEA agents reasonably suspected Mendoza of engaging in criminal activity. A number of circumstances provided a "particularized and objective basis" for their suspicion. Navarette, 134 S. Ct. at 1687 (quotation omitted). Specifically, the Trailblazer's direction of travel matched the directions the agents gave the drug couriers; its arrival at the hotel corresponded with a text message from the couriers saying "I see it"; the Trailblazer followed, in real time, the agents' instruction to drive along the right side of the hotel; the Trailblazer was registered in Fulton County, Georgia (where Love had picked up methamphetamine); the Trailblazer's occupants seemed to be peering at room numbers while driving through the parking lot; the occupants were observed to be two Hispanic individuals, which roughly matched how Carlos and his associates had described the couriers; and the Trailblazer parked in front of Room 136, which was next to Room 138, the room where the couriers were told to come. Although any one of these facts in isolation might be "susceptible of innocent explanation," together they provided an adequate basis for the agents' reasonable suspicion. Arvizu, 534 U.S. at 277–78, 122 S. Ct. at 753. The DEA agents were entitled to "draw on their own experience and specialized training to make inferences from

7

and deductions about the cumulative information available to them," and thus conclude from these facts that Mendoza was on his way to deliver drugs.[3] Id. at 273, 122 S. Ct. at 750–51.

B.    De Facto Arrest

Alternatively, Mendoza claims that the investigative stop matured into a de facto arrest before the agents had probable cause. He argues the stop became an arrest because the DEA agents blocked his vehicle, ordered him out, handcuffed him, and patted him down. After considering the relevant factors, we conclude that this remained a valid investigative stop.

*1. Purpose*

First, the agents detained Mendoza to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly. See Acosta, 363 F.3d at 1146. In Acosta, officers had been surveilling the defendant in connection with money laundering. Id. at 1142–43. After observing suspicious behavior, they stopped Acosta as he was driving out of a parking lot. Id. at 1143. The officers

---

[3] Mendoza emphasizes that the agents knew, through Love, that a previous drug pickup had been carried out by people driving a white Ford Expedition, and that there was some uncertainty over the number and gender of couriers. Considering the totality of the circumstances, these uncertainties are not enough to defeat the agents' reasonable suspicion. It was reasonable to believe that the couriers were using a different vehicle during this drug buy. And Carlos, who arranged the meeting, had described the couriers as "two Mexicans" without specifying gender. The agents observed two people who were Hispanic, one man and one woman. Reasonable suspicion does not require that agents rule out every possibility of innocent conduct. See Arvizu, 534 U.S. at 277, 122 S. Ct. at 753; see also United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 695 (1981) ("[Reasonable suspicion] does not deal with hard certainties, but with probabilities.").

blocked Acosta's car, and at least one officer drew his gun. Id. The officers also took Acosta's identification and patted him down before asking for consent to search the car, an apartment, and articles found inside. Id. This Court held that the stop did not mature into a de facto arrest. Id. at 1145–48. Regarding the first factor, we said that the officers' investigative method "was designed to lead to a quick and non-intrusive resolution of the officers' reasonable suspicions." Id. at 1146. The same is true here. The DEA agents blocked the Trailblazer to prevent escape, ordered Mendoza out of the vehicle, asked for consent to search the vehicle, and deployed a drug dog when consent was denied. This course of investigative action was designed to (and in fact did) promptly confirm or dispel the suspicion that Mendoza was transporting methamphetamine.

*2. Diligence*

Second, as in Acosta, "[n]othing in the record indicates that the police were less than prompt in carrying out their on-the-scene investigation. Each investigatory act logically led to the next act which was done without delay." Id. Mendoza does not allege any undue delay on the part of the agents. Based on the timing of the text messages, Agent Lammers testified that the investigative stop lasted approximately ten minutes, and he also noted that the drug dog was already on the scene, ready to go. The agents' diligence weighs in favor of the stop's legality.

9

*3. Scope*

Third, the scope of the investigation was not excessive in the circumstances. This factor asks whether "the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." Id. Agents conducting an investigative stop "may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." Id. (quotation omitted). Here, the agents ordered Mendoza out of the vehicle, handcuffed him, and patted him down because of concerns about officer safety. These concerns were based on the agents' belief that Mendoza was transporting a large quantity of drugs as well as their knowledge that Love, a purported co-conspirator, had been arrested a few days ago carrying a loaded handgun while transporting methamphetamine. On this record, we cannot say that the agents' actions exceeded what was reasonably necessary to ensure their safety. See United States v. Hastamorir, 881 F.2d 1551, 1556–57 (11th Cir. 1989) (finding it reasonable for officers to handcuff defendant for safety reasons during an investigative stop related to a large drug transaction); United States v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985) ("[N]either handcuffing nor other restraints will automatically convert a Terry stop into a de facto arrest." (emphasis omitted)); Acosta, 363 F.3d at 1147 (concluding that officers reasonably suspected defendant might have a weapon because they believed he was

10

transporting high-value property in his car, and that keeping him away from the car was reasonable because it had not been searched for weapons).[4]

### 4. Duration

Finally, the duration of the stop was relatively short. "There is no rigid time limitation or bright line rule regarding the permissible duration of a Terry stop." Acosta, 363 F.3d at 1147. We look to whether the agents detained the defendant longer than necessary to confirm or dispel their suspicions. Id. In Acosta, this Court concluded that a stop of twenty to thirty minutes was valid. See id. at 1147–48. And in United States v. Gil, 204 F.3d 1347 (11th Cir. 2000) (per curiam), this Court held that a detention of seventy-five minutes was reasonable because the officers were actively investigating the defendant's residence during that time. Id. at 1350–51. The stop here lasted approximately ten minutes, and the DEA agents were actively investigating their suspicions during that time. In sum, all four factors support the stop's legality in this case.

\* \* \*

Viewing the evidence in the light most favorable to the government, the DEA agents here had reasonable suspicion to conduct an investigative stop, and that investigative stop did not mature into a de facto arrest before the agents had

---

[4] Mendoza also argues that his rights were violated because he was not "free to leave." Agent Lammers admitted that Mendoza was not free to leave during the stop. But "freedom to leave" is not the test for reasonableness under Terry. See Acosta, 363 F.3d at 1147 ("[T]he very nature of a Terry stop includes stopping a suspect from leaving.").

11

probable cause.  We AFFIRM the district court's denial of Mendoza's motion to suppress.

**AFFIRMED.**