[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 19, 2007
THOMAS K. KAHN
CLERK

No. 05-14475

D. C. Docket No. 03-00493 CR-17-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EFRAIN GARCIA-JAIMES,
a.k.a. Peluchin,
ARMANDO BARAGAN RAMIREZ, et al.,

Defendants-Appellants.

No. 05-14481

D.C. Docket No. 03-00493 CR-9-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DANTE RODRIGUEZ-SOTELO,

Defendant-Appellant,

_____

No. 05-14482
_____

D. C. Docket No. 03-00493-CR-18-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEOPOLDO VALENCIA CERVANTES,
a.k.a. Polo,

Defendant-Appellant,

_____

No. 05-14483
_____

D. C. Docket No. 03-00493-CR-8-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICIO VARGAS,

Defendant-Appellant,

2

_____

No. 05-14669

_____

D. C. Docket No. 03-00493-CR-11-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAIME GONZALES MEJIA,
JOSE ANTONIO VALDOVINOS-BUSTO,

Defendants-Appellants,

_____

No. 05-17251

_____

D.C. Docket No. 03-00493 CR-3-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEONARDO NUNEZ-VIRRAIZABAL,

Defendant-Appellant,

_____

No. 06-10121

_____

UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                          versus

LUIS EDUARDO PEREZ,

                                        Defendant-Appellant.

                    _____

            Appeals  from the United States District Court
              for the Northern District of Georgia

                    _____

                    **(April 19, 2007)**

Before DUBINA and COX, Circuit Judges, and SCHLESINGER,* District Judge.

DUBINA, Circuit Judge:

     This is a huge, complex, multi-defendant criminal drug case in which the district court judge presided over three separate trials in the United States District Court for the Northern District of Georgia.  The original indictment charged 30 individuals with multiple drug trafficking, firearm, and money laundering offenses.  Seventeen of those individuals pled guilty.  Of the remaining 13 defendants, ten proceeded to trial and three entered guilty pleas.  The

_____
*Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

cases were consolidated on appeal.

## I. BACKGROUND

A. Procedural History

The first jury trial began on January 5, 2005. Defendants Rigoberto Garcia Jaimes ("Rigoberto"), Efrain Garcia Jaimes ("Efrain"), Roberto Moreno Gonzalez ("Roberto"), Armando Baragan Ramirez ("Armando"), Alejandro Hernandez Hernandez ("Alejandro"), Sabas Jaimes Enriques ("Sabas"), and Leonardo Nunez Virraizabal a/k/a Noel Chavez Moreno ("Leonardo") were tried together. After a three-week trial, the jury returned its verdicts finding Armando guilty on Counts One (drug conspiracy), Six (possession of a firearm in furtherance of a drug trafficking crime), and Twenty-Six (money laundering conspiracy); Roberto guilty on Counts One (drug conspiracy), Two (possession of a firearm in furtherance of a drug trafficking crime), and Twenty-Six (money laundering conspiracy); Rigoberto guilty on Counts One (drug conspiracy), Three (possession of a firearm in furtherance of a drug trafficking crime), Four (alien in possession of a firearm), and Twenty-Six (money laundering conspiracy); Efrain guilty on Counts One (drug conspiracy), Four (alien in possession of a firearm), and Twenty-Six (money laundering conspiracy); Alejandro guilty on Counts One (drug conspiracy) and Twenty-Six (money laundering conspiracy); Sabas guilty on Counts One (drug

5

conspiracy), Five (possession with intent to distribute cocaine), and Twenty-Six (money laundering conspiracy); and Leonardo guilty on Counts One (drug conspiracy) and Twenty-Six (money laundering conspiracy).

On February 1, 2005, defendant Luis Eduardo Perez ("Luis") proceeded to jury trial, and on February 8, the jury found him guilty on Count One (drug conspiracy).

On March 9, 2005, defendants Jaime Gonzales Mejia ("Jaime") and Jose Valdovinos Busto ("Jose") proceeded to jury trial. On March 22, the jury found Jaime guilty on Counts One (drug conspiracy), Nine (possession of a firearm in furtherance of a drug trafficking crime), and Ten (alien in possession of a firearm) and Jose guilty on Counts One (drug conspiracy) and Twenty-Six (money laundering conspiracy).

Defendants Leopoldo Valencia Cervantes ("Leopoldo"), Patricio Vargas Jiminez ("Patricio"), and Dante Rodriguez Sotelo ("Dante") each entered guilty pleas. Leopoldo pled guilty to Counts One (drug conspiracy) and Twenty-Six (money laundering conspiracy). Patricio pled guilty to Counts One (drug conspiracy), Eighteen (possession of a firearm in furtherance of a drug trafficking crime), Twenty (alien in possession of a firearm), and Twenty-Six (money laundering conspiracy). Dante pled guilty to Counts One (drug conspiracy),

6

Seventeen (possession of a firearm in furtherance of a drug trafficking crime), Nineteen (alien in possession of a firearm), and Twenty-Six (money laundering conspiracy).

After lengthy sentencing hearings, the defendants received the following sentences:

Rigoberto- 420 months imprisonment
Efrain- 350 months imprisonment
Alejandro- 292 months imprisonment
Roberto- 480 months imprisonment
Patricio- 240 months imprisonment
Dante- 220 months imprisonment
Jaime- 270 months imprisonment
Armando- 295 months imprisonment
Leopoldo- 190 months imprisonment
Sabas- 300 months imprisonment
Jose- 280 months imprisonment
Leonardo- 290 months imprisonment
Luis- 135 months imprisonment

The defendants then perfected their appeals. All of the defendants are incarcerated.

B. Facts

In 2002, the Drug Enforcement Administration ("DEA") directed agents in Atlanta, Georgia, and McAllen, Texas, to investigate a Mexican drug trafficking organization that was importing cocaine, marijuana, and methamphetamine into

the United States for distribution in the Atlanta area. The investigation included surveillance of various members of the organization, as well as Title III wiretaps that resulted in numerous intercepted telephone calls among the organization members. By the time of trial, the authorities had intercepted over 30,000 telephone calls by way of wiretap. These intercepted telephone calls confirmed that the members of the organization were engaged in the possession and distribution of cocaine, marijuana, and methamphetamine. The intercepted calls also confirmed that the members of the organization were collecting money from the sale of the drugs to send to Mexico. The drug proceeds also paid the operating expenses of the organization in the United States, including mortgages and rent for residences and stash houses, purchase of vehicles and firearms for use by the organization members, and purchase of tractor-trailers and cover load cars and trucks to transport the drugs and money.

Roberto was the leader of the drug organization. Rigoberto worked for Roberto supervising the drug distribution and money collection for the Atlanta area. Ramon Alvarez Sanchez ("Ramon") and his brother Antonio Alvarez ("Antonio") had their own source of marijuana in Mexico, but they purchased cocaine from Roberto, either directly or through Rigoberto. Ramon operated his own organization distributing cocaine and marijuana in Atlanta and other cities.

8

Through use of his trucking company, Ramon arranged for transportation of drugs for Roberto and Rigoberto, as well as for himself. Luis worked for Ramon and drove the trucks that transported drugs from Texas to Atlanta by using cover loads of either cabbages or watermelons.

Rigoberto supervised Efrain and Sabas, and reported back to Roberto. Efrain and Sabas delivered drugs and collected money for Rigoberto. As part of his duties, Rigoberto also obtained and maintained stash houses located in the Atlanta area at Canberra Court, Ringtail Drive, Robin Hill Drive, Waterbrook Terrace, Murdock Court, and Shenta Oak Drive. The stash house at Canberra Court was Sabas's residence, but he later moved to the Waterbrook Terrace house. Alejandro, Armando, and Leopoldo manned the stash house located on Ringtail Drive. Jaime manned the stash house located on Robin Hill Drive.

Marcos Ibarra Nunez, a/k/a Marco Antonio Sotelo Ibarra, a/k/a Marco Pelaez Sotelo ("Marcos") worked for Rigoberto as a supervisor, and he too obtained and maintained residences and stash houses in the Atlanta area, including stash houses located on Woodstock Drive and Oak Vista Way.

Leonardo, Roberto's cousin, manned the Woodstock Drive stash house along with Eliodoro Moreno Contreras ("Eliodoro"), and the lease for this house was in Leonardo's name. Dante, Patricio, Jose, and Gonzalo Vidales Cisneros

9

("Gonzalo"), a cooperating co-conspirator, manned the Oak Vista Way stash house.

Prior to trial, the defendants filed motions to suppress evidence. The first motion dealt with the suppression of consent searches of two addresses to which Leonardo was connected: (1) 3000 Briarcliff Road and (2) 3078 Clairmont Road. A magistrate judge entered a report recommending the denial of this motion to suppress after finding that there was a consent to search for each apartment. The district court overruled Leonardo's objections and adopted the magistrate judge's recommendation.

All defendants filed motions to suppress the fruits of court-authorized electronic surveillance based upon an alleged lack of probable cause. Several defendants also argued that the government improperly sealed the recordings in violation of 18 U.S.C. § 2518(8)(a). They alleged that the government used a recording device that actually recorded the intercepted communications on a computer's hard disk and then the government made a copy of the information contained on the hard disk. It was this copy, rather than the hard disk, that was sealed.

A magistrate judge entered a report recommending denial of these motions. The magistrate judge found that the system used by the government to record the

10

intercepted calls converts the incoming analog signals into digital data recorded on the computer hard drive, and within seconds, the contents of the calls are automatically written onto a "magneto optical disk" ("MOD"). The magistrate judge further found that the contents of the calls cannot be altered and are not degraded during the transfer to the MOD; that the MOD should be considered a duplicate of the original; and that sealing the MOD satisfies the requirements of the wiretap statute, which does not require sealing original recordings. The district court adopted the magistrate judge's report and further determined that, because there is no possibility of alteration, the MOD should be considered a duplicate of the original. Moreover, the district court held that the wiretap statute does not require the sealing of original recordings. Thus, the district court ruled that sealing the MOD satisfied the sealing requirements of the statute, and, accordingly, the court adopted the magistrate judge's recommendation and denied the motions to suppress.

**First Trial**

The main witness against Rigoberto, Efrain, Roberto, Armando, Alejandro, Sabas, and Leonardo was DEA Special Agent Robert Murphy ("Agent Murphy"), who was qualified as an expert based on his training on, and experience with, drug trafficking methodologies of Mexican based organizations, particularly in the

11

areas of drug identification, interpretation of coded conversations, drug pricing, and transportation techniques. Agent Murphy testified that this organization imported the drugs from Mexico and shipped the proceeds back to Mexico. He further testified that those in the command and control of the organization are in Mexico. Salvador Carrillo Sanchez ("Salvador"), a cooperating co-conspirator, also testified that the drugs involved in this conspiracy came from Mexico. Both Salvador and Agent Murphy testified that Roberto led the United States side of the organization, that many of the drugs were transported from Mexico to McAllen, Texas, and from McAllen to Atlanta, and that the members then transported the drug proceeds, concealed in gas tanks on car hauler trailers, back to McAllen.

At trial, numerous intercepted telephone calls among the organization members establishing the hierarchy and operations of the organization were played for the jury, and Agent Murphy testified regarding the content of those telephone calls. Agent Murphy and Special Agent Keith Cromer ("Agent Cromer") testified that, as a result of several of the intercepted telephone calls, DEA agents seized money and/or drugs and executed search warrants at several locations associated with Roberto. During the execution of the search warrants, agents seized telephones that were used to call telephones that Roberto used or possessed, as well as quantities of drugs, money and/or other items associated with the

12

distribution of drugs or the collection of drug proceeds, including packaging material, money counters, and drug ledgers.

Agent Murphy also testified regarding the identification process of the organization members. Susan Nunez, a wire monitor witness for the government, testified that over the six months that she monitored telephones in this case, she became familiar with the voices of the targets who were intercepted, including their nicknames.

### Second Trial

Luis testified at his trial that he was a legitimate truck driver and that he had no knowledge that he was ever carrying marijuana in his trailer. Luis also testified that he did not know that Ramon was a drug dealer. Nick Garcia, a co-conspirator, testified against Luis. Additionally, Agent Murphy testified regarding several intercepted calls between Ramon and Luis.

### Third Trial

During Jaime and Jose's trial, Agent Murphy, as well as Special Agent Cromer, again testified as an expert in Mexican drug trafficking organizations. Agent Murphy testified that in a Mexican drug trafficking organization, the people who are allowed access inside a stash house have to be trusted members of the organization. Agent Murphy further testified that in a Mexican drug trafficking

13

organization, firearms in a stash house are used to protect the drugs and money as well as the individuals involved. Agent Cromer testified that alcohol and acetone are used to reprocess methamphetamine into crystal methamphetamine ("ice"). Agent Cromer further testified that methamphetamine is sold in pound quantities. The agents also testified about the Robin Hill stash house and the items that were seized from that house after execution of the search warrant.

After the conclusion of the third trial, where the jury found all defendants guilty, the district court sentenced the defendants as previously noted.

## II.  ISSUES

(1) Whether the evidence was sufficient to support the defendants' convictions.

(2) Whether the district court abused its discretion by admitting the transcript of an intercepted telephone call or, alternatively, by refusing to sever Armando or Alejandro.

(3) Whether the district court abused its discretion by permitting DEA agents to testify as expert witnesses about the structure and organization of, and the use of code words by, Mexican drug trafficking organizations.

(4) Whether the district court erred by admitting the wiretap evidence.

14

(5) Whether the district court erred by denying Roberto's motions to suppress the fruits of his arrest.

(6) Whether the district court's jury instruction on money laundering was erroneous.

(7) Whether the district court erred by denying Leonardo's motion to suppress the searches of two addresses connected to Leonardo.

(8) Whether the district court abused its discretion by excluding evidence of a 25-year-old prior conviction of a government witness.

(9) Whether the district court abused its discretion by refusing to charge the jury on coercion and multiple conspiracies.

(10) Whether the district court clearly erred in determining the drug quantity attributable to Dante, Armando, and Jose.

(11) Whether the district court erred in determining Dante and Jose's offense levels pursuant to U.S.S.G. § 2S1.1, and whether the district court impermissibly double-counted Dante and Jose's relevant conduct.

(12) Whether the district court committed clear error by finding that the defendants did not meet their burden of proving entitlement to a downward adjustment for their role in the offenses.

(13) Whether the district court erred by finding that Dante was subject to the ten-year mandatory minimum sentence set forth under 21 U.S.C. § 841(b)(1) based on its determination of drug quantity by a preponderance of the evidence.

(14) Whether Dante and Jose's sentences were unreasonable.

(15) Whether the district court committed clear error by finding that Leopoldo was not entitled to safety-valve relief.

(16) Whether we should consider Leopoldo's ineffective assistance of counsel claims on direct appeal.

## III.  STANDARDS OF REVIEW

The sufficiency of the evidence supporting a criminal conviction is a question of law and is reviewed *de novo*; however, we examine the evidence in the light most favorable to the government and make all inferences and credibility choices in the government's favor.  *United States v. Silvestri*, 409 F.3d 1311, 1327 (11th Cir.), *cert. denied*, 126 S. Ct. 772 (2005).  The denial of a motion for judgment of acquittal is reviewed *de novo*.  *United States v. Hernandez*, 433 F.3d 1328, 1332 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 1635 (2006).  "When the motion raises a challenge to the sufficiency of the evidence, we review the sufficiency of the evidence *de novo*, drawing all reasonable inferences in the government's favor."  *Id.* (quotation and citation omitted).

16

A district court's refusal to exclude evidence under Federal Rule of Evidence 403 is reviewed for a "clear abuse of discretion." *United States v. Cross*, 928 F.2d 1030, 1048 (11th Cir. 1991). The decision to deny a severance "is committed to the sound discretion of the trial court and can only be overturned for an abuse of such discretion." *Id.* at 1037.

Evidentiary rulings, including whether to admit expert testimony, are reviewed for an abuse of discretion. *United States v. Garcia*, 447 F.3d 1327, 1334 (11th Cir. 2006).

Ordinarily, a district court's denial of a motion to suppress is reviewed under a mixed standard. *United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000). The court's findings of fact are reviewed for clear error, and its application of law to those facts is reviewed *de novo*. *Id.* However, where trial counsel did not object to the magistrate judge's report and recommendation within the required time period, appellate review of the factual findings is for plain error only. *United States v. Hall*, 716 F.2d 826, 828-29 (11th Cir. 1983).

Where a defendant does not object to a jury instruction at trial, it is reviewed for plain error only. *United States v. Prieto*, 232 F.3d 816, 819 (11th Cir. 2000).

A district court's decision to exclude evidence of a prior conviction pursuant to Federal Rule of Evidence 609 is reviewed for an abuse of discretion. *United States v. Pritchard*, 973 F.2d 905, 908 (11th Cir. 1992).

A district court's refusal to give a requested jury instruction is reviewed for an abuse of discretion. *United States v. Morales*, 978 F.2d 650, 652 (11th Cir. 1992).

A district court's determination of drug quantity to establish the applicable base offense level under the Sentencing Guidelines is reviewed for clear error. *United States v. Simpson*, 228 F.3d 1294, 1298 (11th Cir. 2000). "*Booker* does not alter our review of the application of the Guidelines." *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005). "Post-*Booker*, we continue to review a district court's factual determination of the quantity of drugs properly attributable to a defendant for clear error." *United States v. Smith*, No. 05-10693, slip op. at 9 (11th Cir. Aug. 31, 2005). However, an issue raised for the first time on appeal may be reviewed for plain error only. *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).

"In sentencing guidelines cases, we review for clear error a district court's factual findings and review *de novo* the district court's application of law to those facts." *United States v. Cover*, 199 F.3d 1270, 1274 (11th Cir. 2000). Contentions

18

alleging impermissible double-counting are reviewed *de novo*. *United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir. 2005).

"[A] district court's determination of a defendant's role in the offense is a finding of fact to be reviewed only for clear error." *United States v. De Varon*, 175 F.3d 930, 937 (11th Cir. 1999).

"We review the sentence imposed by the district court for reasonableness." *United States v. Talley*, 431 F.3d 784, 785 (11th Cir. 2005).

We review for clear error the district court's factual determination in deciding whether or not to grant safety-valve relief under U.S.S.G. § 5C1.2. *United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997).

We will not consider an ineffective assistance of counsel claim that is raised for the first time on direct appeal where there has been an insufficient opportunity to develop the record with regard to the merits of the claim. *United States v. Bender*, 290 F.3d 1279, 1284 (11th Cir. 2002); *United States v. McLean*, 138 F.3d 1398, 1406 (11th Cir. 1998).

## IV. <u>DISCUSSION</u>

After reviewing the record, reading the parties' briefs and having the benefit of oral argument, we affirm the defendants' convictions and sentences, except for Roberto's gun conviction and sentence, which we vacate. We will address briefly

19

a few of the issues raised by the defendants.  The remaining issues we affirm

without further discussion.

A.  The money laundering count

Armando, Alejandro, Roberto, Leonardo, and Sabas challenge the

sufficiency of the evidence supporting their convictions on Count Twenty-Six, the

money laundering conspiracy charge.  *See* 18 U.S.C. § 1956(a)(2)(B)(i)

(prohibiting a person from transporting or attempting to transport illicit funds,

from a place inside the United States to a place outside the United States, knowing

that such transportation is designed to conceal or disguise the nature, location,

source, ownership, or control of those proceeds).  In conducting our review, we

are guided by the principle that the government "need not rebut all reasonable

hypotheses other than guilt."  *United States v. Miranda*, 425 F.3d 953, 959 (11th

Cir. 2005) (quoting *United States v. Sellers*, 871 F.2d 1019, 1021 (11th Cir.

1989)).  "[W]e will not disturb a guilty verdict unless, given the evidence in the

record, no trier of fact could have found guilt beyond a reasonable doubt."

*Silvestri*, 409 F.3d at 1327 (internal quotations and citation omitted).

As to the money laundering conspiracy count, the government needed to

prove that two or more individuals agreed to commit a crime and that the

defendants knowingly and willfully joined or participated in the conspiracy.  *See*

20

*Silvestri*, 409 F.3d at 1328. In this count, the object of the conspiracy was transporting or attempting to transport illegal proceeds outside the United States to Mexico, knowing that such transportation was designed to conceal and disguise the nature, location, source, and ownership of the proceeds. Thus, the government did not need to prove that the defendants sent illegal proceeds to Mexico, or that any illegal proceeds successfully made it to Mexico. Rather, the government needed to prove only that the defendants were part of a conspiracy to send illegal proceeds to Mexico.

The defendants challenge their convictions based on their assertion that the government failed to present any evidence that any funds were ever actually transported outside of the United States or that there was any attempt to do so. Specifically, the defendants contend that the government, in an apparent misunderstanding of what constitutes a violation of 18 U.S.C. § 1956(a)(2)(B)(i), only established that drug money was hidden from the police inside cars loaded on the car hauler destined for Mexico. They argue that simply hiding money to avoid detection does not satisfy § 1956(a)(2)(B)(i). We disagree.

For the substantive offense of international money laundering, "the statute requires only that [the defendant] knew his act of transporting the funds was designed to disguise or conceal its nature, source, ownership, or control." *United*

21

*States v. Carr*, 25 F.3d 1194, 1206 (3d Cir. 1994). Thus, the government must prove that "the defendant knew that the funds were derived from an unlawful activity" and "knew the transportation was undertaken to disguise or conceal the money in some material fashion." *Id.*; *see also United States v. Cuellar*, 478 F.3d 282 (5th Cir. 2007) (*en banc*) (considering a challenge to a conviction for international money laundering and finding that the government successfully proved that the transportation or attempted transportation of the funds, wrapped in duct tape and hidden under the floorboard of the car, was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds).

The evidence in this case established that the organization secreted the drug proceeds in car haulers to deliver the proceeds from the United States to Mexico. The evidence also showed that the organization was using drug proceeds to purchase the cars that were on the car haulers and using third parties to conceal the real owners of the cars. *See United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006) (noting that evidence of concealment under the money laundering statute includes using third parties to conceal the real owner), *petition for cert. filed*, (U.S. Dec. 11, 2006) (No. 06-9400). The government presented intercepted phone calls between Roberto and Rigoberto wherein they discussed shipping one

22

million dollars from the United States to Mexico utilizing a car hauler. Another intercepted phone call revealed that in July 2003, Roberto stated that he was in Mexico with his brothers counting the money. Additionally, Agent Murphy testified regarding an intercepted phone call during which Roberto and Rigoberto were discussing the purchase of cars. Another agent testified that agents observed Efrain and Jose Olazaran purchase a Chevy Lumina at a car lot and take it to the car hauler. The government also presented another intercepted phone call in which Roberto and an unidentified male discussed the purchase of a car, and Roberto instructed him to put the car in his wife's name.

We conclude that the evidence was sufficient for a jury to find that the defendants entered into a transportation scheme utilizing car haulers to knowingly transport, or attempt to transport, funds under a plan designed at least in part "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds." 18 U.S.C. § 1956(a)(2)(B)(i). First, hiding the money inside cars on car hauler trailers was an attempt to conceal the money's association with an illegal enterprise. Second, the defendants hid the money in the cars to prevent the authorities from finding it. Third, the transportation plan allowed the owner of the money to place it in the hands of a third party, which makes it difficult to determine both the owner and the source of the money. Accordingly,

23

we affirm the defendants' convictions for conspiracy to violate the money laundering statute.

B. The gun count as to Roberto

Roberto challenges the sufficiency of the evidence to support his conviction on Count Two, possession of a firearm in furtherance of a drug trafficking crime. To support this conviction, the government had to prove that during and in relation to the drug trafficking conspiracy, Roberto "used, carried, or possessed a firearm in furtherance of that conspiracy." *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004). "Possession may be actual or constructive, joint or sole." *Id.* In order to establish constructive possession, "the government must show that the defendant exercised ownership, dominion, or control over the firearm or the [property] concealing the firearm." *Id.*

A review of the record reveals that the government did not meet its burden of proof. The government did not present any evidence that Roberto exercised ownership, dominion, or control over any firearms during the drug trafficking conspiracy. The evidence demonstrated that Roberto stayed in Texas or Mexico during the conspiracy period and did not reside in a stash house in Atlanta. The authorities seized weapons from the Atlanta stash houses. Thus, the government did not present any evidence that Roberto was in a location where he exercised

24

control over any weapon. Accordingly, we vacate Roberto's gun conviction and remand Roberto's case to the district court for further proceedings.

C. The motion to suppress the search of the property

Leonardo argues that the district court erred in denying his motion to suppress the consent search of 3078 Clairmont Road. Leonardo does not claim that the consent was not voluntary; rather, he asserts that the district court erred by concluding that the individual who gave consent to search the residence had the authority to consent. We disagree.

Consent to search may be provided by a third party who possesses common authority over the premises. *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974). "'Common authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797 (1990) (citation omitted). Moreover, even if the consenting party does not in fact have the requisite relationship to the premises, if the officer has an objectively reasonable, though mistaken, good-faith belief that the consent was a valid consent, there is no Fourth Amendment violation. *Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800; *see also United States v. Brazel*, 102 F.3d 1120, 1148 (11th Cir. 1997).

The record demonstrates that during the investigation, authorities searched several residences, including an apartment on Clairmont Road. When officers first arrived at the Clairmont Road apartment, no one was there. The officers spoke with the manager, who informed them that he had seen Silvia Castillo ("Castillo") move into the apartment. The officers obtained information that Castillo was at another apartment on Buford Highway. When the officers located Castillo, she told them that she lived at the Buford Highway apartment and rented the Clairmont Road apartment for her nephew and either his girlfriend or wife. Although Castillo denied living at the Clairmont Road apartment, she told the officers that she routinely went there, even when no one else was there. She agreed to allow the agents to enter and search the apartment and went with the officers to conduct the search. Castillo stated that she was not threatened by the officers in any manner. When the agents arrived at the apartment, they gained entry by using either Castillo's key or a key obtained from the manager. Castillo remained present during the search in which agents seized over $40,000 in U.S. currency, drug packaging materials, and what the officers believed to be a drug ledger.

We conclude from the record that the district court properly denied Leonardo's motion to suppress. At the time of the search, the officers knew that

26

Castillo rented the apartment for her nephew and that the management had observed Castillo moving into the apartment. Moreover, Castillo informed the officers that she had access to the apartment at any time. Based on this information, the officers had a reasonable, good-faith belief that Castillo had the authority to consent to the search. *See Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800. Accordingly, we affirm the district court's order denying Leonardo's motion to suppress evidence seized as a result of the warrantless search of the Clairmont Road apartment.

## V.  <u>CONCLUSION</u>

Based upon our review of the record, we find no merit to any of the defendants' challenges to their convictions and sentences, with the exception of Roberto's challenge to his gun conviction. Accordingly, we affirm all of the defendants' convictions and sentences but vacate Roberto's gun conviction and sentence and remand his case to the district court for further proceedings consistent with this opinion.

**AFFIRMED in part; VACATED and REMANDED in part**.