[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 21, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10703
Non-Argument Calendar
_____

D. C. Docket No. 06-80070-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEONARD ALLEN, JR.,
a.k.a. Little Dred,
WINFRED LORENZO HUNT,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 21, 2008)

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Leonard Allen and Winfred Lorenzo Hunt appeal their convictions and life sentences for committing drug trafficking offenses in 2006, all in violation of 21 U.S.C. § 841, as to Hunt and Allen, and possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g), as to Allen.[1]

Allen and Hunt argue that (1) the district court erred in denying their motion to suppress evidence gathered pursuant to a wiretap because the government's wiretap application did not establish necessity, as required by 18 U.S.C. § 2518(c)(1); (2) the district court erred in denying their motion to suppress evidence gathered during a traffic stop of Allen's car because the police officers who conducted the stop had no probable cause to believe, or reasonable suspicion, that Allen was driving the car; (3) the district court erred under Fed.R.Evid. 404(b) in admitting testimony that a codefendant had purchased drugs from Allen in 2003

---

[1] Allen and Hunt were charged by a federal grand jury, in a 40-count third superceding indictment that also named 14 codefendants, as follows: (1) Allen and Hunt with conspiracy to distribute at least 50 grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 ("Count 1"); (2) Hunt with 32 counts of possession of, with intent to distribute, either an unknown amount or at least 5 grams of crack cocaine, in violation of § 841(a)(1) ("Counts 2-23, 25-29, 31-35"); (3) Allen and Hunt with possession of, with intent to distribute, at least 50 grams of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) ("Count 24"); (4) Hunt with conspiracy to possess with intent to distribute at least 500 grams of crack cocaine, in violation of §§ 841(a)(1) and 846 ("Count 30"); (5) Allen with possession of a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) ("Count 37"); (6) Allen with possession of, with intent to distribute, at least 5 grams of crack cocaine, in violation of § 841(a)(1) ("Count 38"); and (7) Hunt with conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(A)(I) and (b)(I) ("Count 40"). After Allen's, Hunt's, and one other codefendant's joint jury trial, Counts 21, 25, and 40 against Hunt were dismissed on the government's motion, and the jury found Allen guilty of Counts 1, 24, 37, and 38, and Hunt guilty of Counts 1-4, 6-20, and 22-34.

and Hunt in 2005 and testimony that Allen once gave a 16-year-old a gun; and (4) the district court erred in sentencing them as career offenders when their prior convictions were neither pled in the indictment nor proven to the jury beyond reasonable doubt.  For the reasons discussed below, we affirm Allen's and Hunt's convictions and sentences.

## I. Wiretap

As part of its investigation of a suspected South Florida crack cocaine distribution ring, the Drug Enforcement Agency ("DEA") applied for a wiretap on the cellular telephone of Hunt, the suspected ringleader.  With its application, the government submitted the affidavit of a DEA special agent.

In the affidavit, the agent stated that a wiretap was necessary because normal investigative techniques had failed or been of only limited success, or reasonably appeared likely to fail or be too dangerous to employ.  The agent specifically explained the following.  The government had used three confidential defendants ("CD1," "CD2," and "CD3") and three sources of information ("SI1," "SI2," and "SI3").  Although the confidential defendants and sources of information had provided information, it was "historical in value" and was of little use in identifying the organization's members, sources of supply, or methods of operation.  Moreover, the confidential defendants and sources of information

would not supply any further information. CD1 no longer was working with the government because Hunt had become suspicious and stopped talking to him. CD2 worked with the government for a short time after his arrest, but had since stopped. CD3's connection to Hunt's organization was limited to purchasing street-level amounts of crack cocaine, so that he could not provide any information on the internal workings of the organization. Likewise, both S1 and S3 had stopped cooperating with the government, and S2's connection to Hunt's organization was limited to street-level activity.

The government also had used physical surveillance. While their surveillance, which included the use of a pole camera, had generated information that led to the arrest of street-level purchasers and the confiscation of small amounts of crack cocaine, it had not and could not yield information on the manufacturing or distribution dynamics within Hunt's organization. For instance, the government could not get close enough to Hunt and the others to hear the contents of their communications. Also, because of the layout of the area surrounding the key distribution point used by Hunt's organization, which consisted of duplexes, small lots, and limited exits, as well as Hunt's control and counter-surveillance of the area, it was "impossible" to thoroughly surveil the distribution point.

4

The government further had used toll records of the incoming and outgoing calls on Hunt's cellular telephone, undercover police officers, and trash pulls. The toll records were helpful only in corroborating information provided by the confidential defendants and sources of information, but could not reveal the identifications of the callers or the contents of the communications. While undercover police offers had been able to purchase street-level amounts of crack cocaine from people associated with Hunt's organization, they had been unable to infiltrate the organization and gather evidence on its full scope. Also, Hunt and the others had been arrested in the past for crimes of violence, such that continued investigation by undercover police officers posed risks to their safety. While trash pulls also had yielded information about names and locations, the information had proved limited. Also, in order to make the trash pulls, the police officers had to dress as garbage men. Because an actual garbage man recently had been threatened with a gun by Hunt and Allen for an unrelated reason, this method also posed a risk to police officers.

The government had considered using a grand jury investigation and tracking devices placed on Hunt's cars. A grand jury investigation using subpoenas of the suspects would alert Hunt's organization of the investigation, likely causing them to destroy evidence. Also, the parties subpoenaed likely would

5

not testify for fear of reprisal or self-incrimination. Tracking Hunt's cars would be prohibitively difficult and futile, as Hunt owned at least ten cars and rented countless others.

The district court authorized the wiretap, finding that the government had established that it was necessary. Before their trial, Allen and Hunt joined a motion to suppress evidence gathered pursuant to the wiretap, arguing that the affidavit did not show that a wiretap was necessary. The district court denied the motion, and, at trial, evidence gathered pursuant to the wiretap was admitted.

We review a district court's denial of a motion to suppress evidence under a mixed standard. United States v. Garcia-Jaimes, 484 F.3d 1311, 1320 (11th Cir. 2007), petition for cert. filed, (U.S. Jun 11, 2007)(No. 06-11863). Specifically, the district court's findings of fact are reviewed for clear error, while its application of law to those facts is reviewed de novo. Id.

The district court's authority to authorize electronic surveillance is found in Title III of the Omnibus Crime Control and Safe Streets Act of 1968. 18 U.S.C. §§ 2510-2520. Title III sets forth numerous requirements the government must meet before surveillance may be authorized. See 18 U.S.C. § 2518(c)(1). Among these is the requirement that the government prove that a wiretap is necessary. See 18 U.S.C. § 2518(c)(1). Specifically, a wiretap application must include "a full

6

and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Id. We have held, however, that the "affidavit need not. . . show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986).

We previously have considered, and found sufficient to show necessity, an affidavit very similar to the one presented by the DEA in this case. Id. at 1497. In Van Horn, the Federal Bureau of Investigation ("FBI") applied for a wiretap to intercept communications taking place in the office of a man suspected of running a drug distribution ring that used speedboats to transport marijuana from freighters into the United States. Id. at 1495. To establish that the wiretap was necessary, the FBI submitted the affidavit of an agent. See id. at 1496.

The agent first explained that physical surveillance of the marijuana off-load operations was impossible because of anti-surveillance techniques used by the ringleader. Id. at 1496-97. The agent also explained that physical surveillance of the man's office would be impossible, given the physical layout of the area. Id. at 1497. The agent further explained that any physical surveillance conducted would

7

establish only that members of the man's organization were meeting but would not provide admissible evidence that they had committed crimes. Id. Second, the agent explained that "a search of the premises. . . had been considered and rejected because it was not believed that there was sufficient physical evidence there to reveal the entire conspiracy or to successfully prosecute its members." Id. Third, the agent explained that a "sting" operation involving undercover agents and informants would not work because undercover agents already had tried, and failed, to gain an introduction to the man in question and because the informants feared for their lives. Id. Finally, the agent explained that conducting a grand jury investigation was rejected because the necessary witnesses were members of the conspiracy and likely would not voluntarily testify. Id.

As stated above, the affidavit presented here was similar to the affidavit submitted in Van Horn, which we ultimately found sufficient. See id. at 1496-97. Just as in Van Horn, the agent here explained that useful physical evidence was nearly impossible to collect because of Hunt's counter-surveillance measures and the layout of the area to be surveilled. See id. The agent also explained that physical surveillance could not provide the evidence needed to prove criminal wrongdoing, namely the contents of the alleged co-conspirators' conversations. Also just as in Van Horn, the agent here explained that undercover police officers

8

had not been able to infiltrate Hunt's organization and that the confidential defendants and sources of information previously used no longer were providing helpful information.  See id. at 1497.  Further just as in Van Horn, the agent here explained that a grand jury investigation would not meet the government's needs because the necessary parties likely would not testify voluntarily.  See id.

Beyond these similarities, the agent here arguably provided more information than provided in Van Horn, by explaining that car tracking would not suffice because Hunt used so many cars, that trash pulls posed a risk and had not yielded much useful information, and that toll records had revealed only times of calls and not the contents of the communications.  Based on these similarities and the sufficiency of the evidence presented, we find that the affidavit established that the wiretap was necessary.  See 18 U.S.C. § 2518(c)(1).

The fact that the traditional methods in use were producing evidence does not alter our conclusion.  In the affidavit, the agent repeatedly emphasized that this evidence was of street-level transactions only, and therefore unhelpful to the government's goal of revealing the entire conspiracy.  Nothing in the law requires that the traditional methods be entirely useless or that the district court force the government to redefine its objectives.  Indeed, as we indicated in Van Horn, the government's ultimate objective and the traditional methods' usefulness to that

9

objective are important to the necessity inquiry. See Van Horn, 789 F.2d at 1497. Also, the fact that the agent here failed to explain why other confidential defendants and sources of information could not be recruited does not alter our conclusion, as the affidavit otherwise thoroughly established that the traditional methods were insufficient. Accordingly, we affirm Allen's and Hunt's convictions as to this issue. See Garcia-Jaimes, 484 F.3d at 1320.

## II. Traffic Stop

Mary Rita Duggan, an officer with the Delray Police Department, testified that, on February 16, 2006, she was conducting surveillance of a house thought to be used by Hunt's drug-distribution ring for drug transactions. Her method of surveillance included making continuous "drive-bys." While driving by, she saw a green car owned by Allen and another car parked near the house, and Allen, Hunt, and a third man that she could not identify "standing around, chatting." Duggan drove by the house three or four times, and the parties and the cars remained. On her fourth or fifth drive-by, however, the parties and the cars were gone. She alerted other police officers on the surveillance team.

Todd Otsuni, an officer with the Palm Beach County Sheriff's Office, testified that, on February 16, 2006, he received an assignment to stay approximately two to three miles behind a green car that belonged to Allen and

10

was traveling north on Interstate-95. He was told that a traffic block had been set up at the bottom of a certain exit ramp and that a traffic stop of the green car would be conducted at that predetermined place. He was told that the basis of the traffic stop was that Allen, the suspected driver, was a habitual traffic offender with a suspended license and had fled from police officers approximately ten days prior while driving the green car. After the green car was stopped and its occupants exited, Otsuni saw a "trail of crack cocaine leading [from Allen's passenger] back to the car" and a gun on the road near Allen's passenger, which Allen's passenger claimed he took from Allen just before exiting the car. Upon conducting a search of the car, more crack cocaine was found. Allen and his passenger both were arrested and the crack cocaine and gun confiscated. These items were admitted into evidence.

On cross-examination, Otsuni admitted that, until Allen got out of the green car, Otsuni did not see Allen driving, but instead assumed that Allen was driving because it was his car. Otsuni also admitted that, in a report written after the incident, he stated that Allen was observed driving the green car. At this point, Allen made a motion to suppress the evidence gathered during the traffic stop. Allen explained that he did not make the motion before trial because Otsuni's report indicated that Allen had been seen driving the green car before the stop. The

11

district court denied the motion, finding it groundless.

As stated above, we review a district court's denial of a motion to suppress evidence under a mixed standard. Garcia-Jaimes, 484 F.3d at 1320. Specifically, the district court's findings of fact are reviewed for clear error, while its application of law to those facts is reviewed de novo. Id.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Whren v. United States, 517 U.S. 806, 809-810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision. Id. Such an automobile stop is reasonable and constitutional, however, if it is based on either probable cause to believe that a traffic violation has occurred or reasonable suspicion that a crime has been or will be committed. United States v. Chanthasouxat, 342 F.3d 1271, 1275 (11th Cir. 2003) (citing Whren, 517 U.S. at 810, 116 S.Ct. at 1772; Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889).

A stop is supported by reasonable suspicion if, under the totality of the circumstances and "from the collective knowledge of the officers involved in the stop," the police officers have an objectively reasonable suspicion that someone

12

has engaged, or is about to engage, in a crime. United States v. Acosta, 363 F.3d 1141, 1144-45 (11th Cir. 2004). We have cautioned that the suspicion must be "more than an inchoate and unparticularized suspicion or hunch." Id.

Here, based on the collective knowledge of all of the police officers involved, there was more than a hunch that Allen was driving the car and committing a crime, namely driving with a suspended license. See id. The green car that was stopped belonged to Allen. Ten days before the stop, Allen had alluded police officers while driving the green car, such that they knew he drove the green Buick. Moreover, Duggan testified that, on her first drive-by, she saw Allen, Hunt, and another man at the house with the green car and another car and that, on her last drive-by, the three men and the two cars were gone. Thus, the police officers had an objectively reasonable suspicion that Allen was driving the green car. See Chanthasouxat, 342 F.3d at 1275. Although none of the police officers saw Allen behind the wheel and his passenger could have driven the car from the house or Allen could have been in the other car that left the house, it was reasonable to believe that Allen was driving his car. See id.

Also, because the police officers knew that Allen was driving with a suspended license, it was objectively reasonable to believe that he was committing a crime by driving the green car. See Chanthasouxat, 342 F.3d at 1275. Therefore,

13

we find that the traffic stop was supported by reasonable suspicion. See id.

Because the traffic stop was supported by a reasonable suspicion, there is no need to determine whether the police officers had probable cause that a traffic violation had occurred or would occur. Accordingly, we affirm Allen's and Hunt's convictions as to this issue. See Garcia-Jaimes, 484 F.3d at 1320. F.3d at 1320.[2]

### III. Rule 404(b) Evidence

At Allen's and Hunt's joint trial, Ronald Gamble, who was indicted as a codefendant of Allen and Hunt and pled guilty and cooperated with the government in order "to help [himself] best as possible," testified that he purchased crack cocaine from Allen from 2003 to 2005. Allen objected to this testimony on the grounds that it violated Rule 404(b), but the district court allowed it. Gamble also testified that he began buying crack cocaine from Hunt in 2005. Hunt did not object. At the conclusion of the government's direct examination, the district court instructed the jury that it could not consider Allen's prior drug transactions with Gamble in determining Allen's guilt of the crimes charged. The district court instructed that this testimony could be considered only if the jury found beyond a

---

[2] Allen and Hunt do not argue that the traffic stop unlawfully matured into an arrest before there was probable cause or that the police officers lacked probable cause to arrest them and seize the gun and crack cocaine found in the car and on the passenger's person. Accordingly, we need not address these issues. See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1998) (holding that when a defendant fails to offer argument on an issue, it is abandoned).

14

reasonable doubt that Allen was guilty and only for the limited purpose of determining if Allen had the requisite state of mind or intent, acted according to a plan to commit a crime, or committed the crimes charged by accident or mistake. Hunt elected not to have a similar instruction read on his behalf.

Michael Drayton, who also was charged as a codefendant of Allen and Hunt and pled guilty and cooperated with the government in exchange for dropped charges and a potentially reduced sentence, testified that police officers found bullets at his apartment. Certain of these bullets belonged to his cousin, Damien, who was 16 years old. Damien also had a gun for these bullets. Drayton "guess[ed]" that Damien got the gun from Allen. Allen objected to this statement on the grounds that it was speculative. To establish predicate for the statement, the government asked how Drayton knew that Allen had given Damien the gun, and Drayton said because Allen talked about getting the gun back from Damien. Allen objected to this statement on the grounds that it was hearsay and irrelevant, but the district court allowed it and the previous statement.

We review the district court's decision to admit evidence of other crimes, wrongs, or acts for an abuse of discretion. United States v. Matthews, 431 F.3d 1296, 1311 (11th Cir. 2005). However, where a defendant fails to preserve an evidentiary ruling by contemporaneously objecting, we review the ruling for plain

15

error.  United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007).  To prove

plain error, a defendant must show: (1) error, (2) that is plain, and (3) that affects

his substantial rights.  Id. at 1276.  If the defendant satisfies all three conditions, we

may exercise our discretion to recognize the error, if it "seriously affects the

fairness, integrity, or public reputation of judicial proceedings."  Id.

Pursuant to Rule 404(b),

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have established such evidence is admissible if (1) it is relevant to an

issue other than the defendant's character; (2) it is established by sufficient proof to

permit a jury to find that the defendant committed the extrinsic act; and (3) its

probative value is not substantially outweighed by its undue prejudice.  Matthews,

431 F.3d at 1310-11.

Regarding the first prong of this test, a defendant who enters a not guilty

plea makes intent a material issue, which imposes a substantial burden of proof on

the government and which the government may prove with qualifying Rule 404(b)

evidence.  United States v. Edouard, 485 F.3d 1324, 1345 (11th Cir. 2007).  The

relevance of such evidence offered to prove intent is determined by comparing the

16

defendant's state of mind in perpetrating both the extrinsic and charged offenses. Id. Regarding the second prong of this test, the testimony of codefendants offered in exchange for potentially reduced sentences will suffice, especially where the defendant offers nothing to rebut the testimony. Id. Regarding the third prong of this test, we must consider whether it appeared at the commencement of trial that the defendant would contest the issue of intent, the overall similarity of the charged and extrinsic offenses, and the temporal proximity between the charged and extrinsic offenses. Id. As to the temporal proximity of the acts, we previously have found that a six-year span between drug offenses was not so remote as to diminish the prior act's probative value. United States v. Calderon, 127 F.3d 1314, 1332 (11th Cir.1997). We also have explained that any unfair prejudice possibly caused by admitting evidence of prior offenses is mitigated by a district court's limiting instruction to the jury. Edouard, 485 F.3d at 1346.

As to Gamble's testimony on Allen, this evidence of a prior wrong was relevant to an issue other than Allen's character. See Matthews, 431 F.3d at 1310-11. Allen put his intent at issue by pleading not guilty to the conspiracy charge. See Edouard, 485 F.3d at 1345. The prior wrong of selling drugs and the charged offense of selling drugs involve the same state of mind. See id. Also, Gamble's testimony was sufficient to allow the jury to determine that the prior

17

wrong occurred. See Edouard, 485 F.3d at 1345; Matthews, 431 F.3d at 1310-11. Even though Gamble testified for the government "to help [himself] best as possible]," Allen did not attempt to rebut the testimony and Gamble's statements were made against his interest. See Edouard, 485 F.3d at 1345. Furthermore, the probative value of Gamble's testimony was not substantially outweighed by its prejudicial effect. See Matthews, 431 F.3d at 1310-11. As stated above, Allen made his intent a material issue by pleading not guilty. See Edouard, 485 F.3d at 1345. The prior wrong consisted of selling crack cocaine to Gamble, such that it was similar in all known respects to the charged offenses of conspiring to sell crack cocaine and possessing crack cocaine with the intent to sell it. See Edouard, 485 F.3d at 1345. Gamble testified that Allen was his crack cocaine dealer between 2003 and 2005, such that the prior wrong occurred within one year of the offenses charged and fell well within the six-year difference previously found not to violate the third prong of the test. See Calderon, 127 F.3d at 1332. The district court gave a limiting instruction to cure any prejudicial effect of Gamble's testimony. See Edouard, 485 F.3d at 1346. Accordingly, we affirm Allen's conviction as to this issue with respect to Gamble's testimony, because the district court did not abuse its discretion in admitting this testimony. See Matthews, 431 F.3d at 1311.

As to Gamble's testimony about Hunt, if the district court did not abuse its

18

discretion regarding Gamble's testimony about Allen, it did not abuse its discretion in admitting almost identical testimony about Hunt.  See Matthews, 431 F.3d at 1311.  Accordingly, we affirm Hunt's conviction as to this issue with respect to Gamble's testimony, because it did not violate Rule 404(b).[3]

As to Drayton's testimony about Allen, our review is limited to determining whether the district court committed plain error.  See Turner, 474 F.3d at 1275. Allen's objections that the testimony was speculative was not the same as an objection that the testimony constituted  improper evidence of other crimes, wrongs, or acts, under Rule 404(b).  This objection was, therefore, insufficient to preserve a Rule 404(b) objection.

While it is not especially clear, Drayton's testimony of a prior wrong may have been relevant to an issue other than Allen's character.  See Matthews, 431 F.3d at 1310-11.  Drayton's testimony may have been relevant to the government's

---

[3] The government argued on appeal that Hunt's argument that Gamble's testimony about him violated Rule 404(b) should be reviewed for plain error only.  It is not clear which standard best applies.  See Matthews, 431 F.3d at 1311; Turner, 474 F.3d at 1275.  At the beginning of their joint trial, the parties agreed that an objection by one was an objection by all unless a defendant specifically opted out.  When Allen made his Rule 404(b) objection to Gamble's testimony, Hunt did not opt out.  However, because the testimony given at the point of the objection had nothing to do with Hunt, it is arguable that the objection did not either.  Moreover, when the district court judge later gave the limiting instruction regarding Gamble's testimony about Allen, Hunt specifically opted not to have a similar instruction read as to Gamble's testimony about himself, such that it is arguable he did opt out of Allen's Rule 404(b) objection.  We need not resolve this issue, however, because the district court did not abuse its discretion in admitting the testimony and, therefore, could not have committed plain error.  See id.

19

charge that Allen was a convicted felon in possession of a gun, in that it illustrated that Allen had the opportunity to possess a gun and did not possess a gun through accident or mistake. See Fed.R.Evid. 404(b). Also, although it lacked the normal indicia of reliability, in that Drayton only "guess[ed]" at the source of the gun, Drayton's testimony seemed sufficient to allow the jury to determine that the prior wrong occurred. See Edouard, 485 F.3d at 1345; Matthews, 431 F.3d at 1310-11. Furthermore, the probative value of Gamble's testimony was not substantially outweighed by its prejudicial effect. See Matthews, 431 F.3d at 1310-11. Although Drayton did not provide enough testimony to analyze the similarity and temporal proximity of the prior wrong and Allen's charged gun offense, the fact that Drayton stated that he could only "guess" that Allen was the source of the gun may well have diminished the testimony's prejudicial effect in the minds of the jury. See Edouard, 485 F.3d at 1345. Thus, it is not clear that the district court committed an error that was plain. See Turner, 474 F.3d at 1276.

Even had the district court committed an error that was plain, however, the record does not demonstrate that the error affected Allen's substantial rights or affected the fairness, integrity, or public reputation of the judicial proceedings. See id. Other evidence presented at trial clearly established that Allen had access to guns. For instance, Allen's passenger during the traffic stop was caught with a

20

gun and indicated that the gun came from Allen. Thus, the jury did not learn anything through this evidence that it had not already heard. Accordingly, we affirm Allen's conviction as to this issue with respect to Drayton's testimony, because it was not plain error for the district court to admit it. See Turner, 474 F.3d at 1275-76.

## IV. Career Offender

Before Allen's and Hunt's separate sentencing hearings, a probation officer prepared presentence investigation reports. In these, the probation officer indicated that Allen and Hunt were career offenders. While the probation officer did not alter Allen's and Hunt's offense levels based on this determination,[4] he did set their criminal history categories at VI based on this finding. Both before and at their separate sentencing hearings, Allen and Hunt objected to being sentenced as career offenders in this manner, as their prior convictions were neither pled in the indictment nor proven to the jury. Relying on this Circuit's binding case law, the district court denied their objections and sentenced both Allen and Hunt to life imprisonment.[5]

---

[4] The probation officer found that the offense levels reached using Allen's and Hunt's offenses, specific offense characteristics, and enhancements was greater than the level mandated by U.S.S.G. § 4B1.1(b) for career offenders.

[5] Allen's and Hunt's total offense levels were 42 and criminal history categories were VI. Thus, their guideline imprisonment ranges were 360 months to life. However, because the statutory term of imprisonment for Counts 1 and 24 was life, pursuant to 21 U.S.C. § 841(b)(1)(A), U.S.S.G.

We review constitutional errors in sentencing de novo, but will reverse only for harmful error.  United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).  We lack authority to alter Supreme Court precedent.  See Hohn v. United States, 524 U.S. 236, 252-53, 118 S.Ct. 1969, 1978, 141 L.E.2d 242 (1998).

In Almendarez-Torres, the Supreme Court held that the government need not allege prior convictions in its indictment or prove such prior convictions beyond a reasonable doubt before using them to enhance a defendant's sentence.  523 U.S. at 243-44, 118 S.Ct. at 1230-31.  This rule has been reaffirmed by the Supreme Court.  See Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000) (creating a prior-conviction exception by holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt");  Blakely v. Washington, 542 U.S. 296, 301, 303-04, 124 S.Ct. 2531, 2536, 2537-38, 159 L.Ed.2d 403 (2004) (reiterating the Apprendi Court's language); Booker v. United States, 543 U.S. 220, 244, 125 S.Ct. 738, 756, 160 L.Ed.2d 621 (2005) (holding that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be

§ 5G1.1(c)(2) mandated that their guideline imprisonment ranges be life.

22

admitted by the defendant or proved to a jury beyond a reasonable doubt").  In Shepard, the Supreme Court arguably cast doubt on the continuing validity of Almendarez-Torres by explaining that, while determining whether a prior burglary was a violent felony for the purposes of the armed-career-criminal enhancement could be "described as a fact about a prior conviction, it [was] too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to Jones v. United States, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)] and Apprendi, to say that Almendarez-Torres clearly authorizes a judge to resolve the dispute."  544 U.S. at 25-26, 125 S.Ct. at 1262-63 (limiting the types of evidence a district court can consider in making the determination).

However, we have held that Almendarez-Torres controls, even in light of Shepard.  See United States v. Camacho-Ibarquen, 410 F.3d 1307, 1316 n.3 (11th Cir. 2005) ("Although recent decisions, including Shepard . . . , may arguably cast doubt on the future prospects of Almendarez-Torres's holding regarding prior convictions, the Supreme Court has not explicitly overruled Almendarez-Torres. As a result, we must follow Almendarez-Torres.");  United States v. Orduno-Mireles, 405 F.3d 960, 963 (11th Cir. 2005) ("Almendarez-Torres remains the law until the Supreme Court determines that Almendarez-Torres is not

23

controlling precedent.").

Here, the district court appropriately applied <u>Almendarez-Torres</u>.  <u>See</u> <u>Camacho-Ibarquen</u>, 410 F.3d at 1316 n.3.  Accordingly, the district court did not err in sentencing Hunt and Allen as career criminals, and we affirm their sentences.

**CONVICTIONS AND SENTENCES AFFIRMED.**